# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS
# WESTERN DIVISION

HAMPDEN, ss.

MICHELE LEADER ET AL

    Plaintiffs,

v.

WAL-MART STORES, INC.
Defendant.

)
)
)
)
)    CIVIL ACTION NO. 04-CV-30055-KPN
)
)
)

### PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE OR DELIMIT THE DEFENDANT'S VOCATIONAL AND MEDICAL EXPERT WITNESSES

Now come the Plaintiff's and move this Court *in Limine* to exclude and alternatively to restrict the testimony of the Defendant's proposed Vocational Expert, Amy E. Vercilllo and the Defendant's proposed Medical Expert Dr. Thomas P. Goss.

In order for expert testimony to be admissible, the proposed testimony must meet a number of very fundamental criteria. Assuming *arguendo* that the expert has sufficient credentials, the experts opinion must be based on facts that are in evidence or will be placed in evidence in a case. Any expert opinion testimony is limited to the expert's field of knowledge or expertise. Further an expert's opinion must be solidly grounded based upon accepted methodologies in science and cannot be based upon hearsay evidence supposition or simple guess work. Any such testimony must rest on a "reliable foundation and [be] … relevant to the task at hand." Currier v. United Technologies Corp., 393 F. 3d 246, 251 (1st Cir. 2004).

Under the Federal Rules of Practice, the parties are required to disclose the opinions of their experts in written form and their experts are restricted to testifying within the bounds of the opinions expressed. *See* Fed. R. Civ. P. 26. In this case, the Defendant Wal-Mart has submitted reports from two (2) individuals who have been identified as testimonial experts in this matter. First is a report by a purported Vocational Expert, Amy E. Vercillo, which is dated May 20, 2005. See report of Ms. Vercillo attached hereto as Exhibit 1 and incorporated by reference. The second report was prepared by Dr. Goss and is dated June 13, 2005. See report of Dr. Goss attached hereto as Exhibit 2 and incorporated by reference. For the reasons stated below, neither of these reports passes muster and the Defendant should be precluded from introducing the testimony of these experts at trial and should be precluded from referencing the opinions

of these proposed experts during the course of trial and opening statements, during cross examination or direct examination of witnesses or during closing arguments.

1.    **VOCATIONAL EXPERT**

The report of Ms. Vercillo is based substantially on medical opinions articulated by a Dr. Kirk Johnson. Dr. Johnson was retained by the Defendant to review the Plaintiff's medical records and to render a report to the Defendant's counsel. Dr. Johnson purportedly did review the Plaintiff's medical records, and did prepare a report but at no time did Dr. Johnson examine the Plaintiff Michele Leader nor was he ever her treating physician. Ultimately, because Dr. Johnson refused to examine the Plaintiff if there was a witness present, the Defendant made a determination to retain the services of a different physician, Dr. Goss, to conduct an examination of the Plaintiff Michele Leader on behalf of Wal-Mart. Dr. Johnson's record review report, assuming that he in fact did review the records, is not admissible into evidence without his presence on the witness stand. The Defendant has not identified Dr. Johnson as one of its witnesses within the time provided for such identification. Consequently, the report of Ms. Vercillo, and her conclusions, since it substantially relies upon, and assumes the correctness of, the medical opinions and conclusions articulated by Dr. Johnson, are fatally flawed and should be stricken.[1]

The opinion of Ms. Vercillo with regard to the Plaintiff's ability to go to work describes an opinion of her ability to work by hypothesizing that her overall medical condition is different than is the actual fact. That is, she states an opinion that if Ms. Leader only had injuries to her knees, assuming facts not in evidence with respect to Dr. Johnson, speculating about others with respect to a return to work after cessation of Coumadin therapy, and had none of the other medical conditions from which she suffers, then she may be able to function in a workplace. The Plaintiff submits that this opinion is purely speculative, and suggests that the jury should, contrary to the law, ignore the evidence and the natural condition of the Plaintiff upon which the injuries caused by the Defendant's negligence were superimposed. The Plaintiff submits that an expert opinion which is contrary to the law should not be allowed and the testimony should be excluded.

2.    **Dr. Goss Medical Expert**

At the request of the Defendant, Dr. Goss conducted a cursory examination of the Plaintiff Michele Leader for less than fifteen (15) minutes on June 10, 2005. Dr. Goss delivered a report dated June 13, 2005, in which he described his examination and further

---

[1] It should be noted that the Defendant has not claimed in its expert disclosures that Ms. Vercillo has independent training and expertise in the necessary medical fields to draw the conclusions or reach the opinions upon which the analysis of the Plaintiff's medical condition rest, independent of admissible medical expert testimony. In short she is not qualified to draw or form any conclusions, to which she can testify, about the Plaintiff's medical condition. Furthermore, her ultimate conclusion assumes medical facts and rests upon an assumption based on Dr. Johnson's opinion.

described, as a basis of his opinion that he relied on the aforementioned report of Dr. Kirk Johnson. Dr. Goss does not describe reviewing the medical records independently and does not describe any activity to ascertain through a review of medical records the background of medical history of the Plaintiff. Rather, he relies entirely on the inadmissible report of Dr. Johnson.

As noted above, Dr. Johnson report is inadmissible hearsay and to the extent that Dr. Goss is being proposed to testify about medical issues, beyond what he observed in his examination of the Plaintiff his testimony should be stricken and excluded. In addition, the report of Dr. Goss should be excluded or at least redacted to the extent that it makes any reference to or relies upon any comments or conclusions or other materials based upon, taken from or referencing the purported record or review report of Dr. Johnson.

THE PLAINTIFF'S
MICHELE LEADER, ET AL

Date:    October 21, 2005

By
John J. McCarthy, Esquire
Doherty, Wallace, Pillsbury, and
Murphy, P.C.
One Monarch Place
1414 Main Street, 19th Floor
Springfield, MA 01144
Telephone: 413-733-3111
Facsimile: 413-734-3910
BBO# 328280

## CERTIFICATE OF SERVICE

I, John J. McCarthy, Esquire, Counsel of Record, do hereby certify that I made service of the foregoing document by mailing a copy of same, postage prepaid, first class mail, to:

Chauncey D. Steele IV, Esq.
Craig and Macauley
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210

Date:  10/21/05

John J. McCarthy, Esq.

285754.1

***R*** **Rehabilitation and**

***R*** **Re-Employment** inc.

New England Regional Office

115 Cedar Street • Providence RI 02093-1035

(401)272-4552  •  (401)331-4336 fax
1-800-294-5323

May 20, 2005

Attorney Chauncey D. Steele IV
Craig and Macauley
Federal Reserve Plaza
600 Atlantic Ave
Boston MA 02210

**RE:**              LEADER, Michele

### VOCATIONAL ASSESSMENT

**BACKGROUND:**  Michele Leader is a 37-year-old (DOB 1/12/68) Special Education Teacher who states she injured her knee in a trip and fall accident at the Westfield Wal-Mart store on 2/1/02. This file was referred to Rehabilitation and Re-Employment for a Vocational Assessment to determine the manner in which Ms. Leader's medical impairments create vocational handicaps, and the impact those handicaps have on her vocational options and earning capacity.

The conclusions in this report are based on my review of the relevant medical, educational, and vocational information forwarded to me, as well as the use of standard vocational information, including the Dictionary of Occupational Titles, Guide to Occupational Exploration, U.S. Department of Labor, and Massachusetts Department of Employment and Training Labor Market Statistics.

**SIGNIFICANT MEDICAL BACKGROUND:** On February 1, 2002 Ms. Leader states that she tripped over some foul weather mats at the entrance to Wal-Mart in Westfield MA. She reported the incident to the store manager and went home. She later reported to the Noble Hospital Emergency Room where she was evaluated and discharged with instructions to rest, put ice on her knee and follow up with her treating physician. The Noble Hospital radiology report of 2/1/02 notes a normal right knee exam. She reported the following week to Dr. Drinker an orthopedic surgeon who had been treating her for left knee pain; he confirmed the diagnosis of a contusion. Dr. Drinker notes that she "simply has bruised her knees and because of her obesity and pre-existing tendonitis this is going to take a number of weeks to resolve."

She was out of work for two weeks and then on vacation for one week. Ms. Leader returned to work after her vacation and continued to work at her position as Special Education Teacher until she underwent knee surgery in October 2002. She has not returned to work since that time.

Ms. Leader's past medical history is positive for asthma, cholecystectomy, headaches, and left knee pain. Dr. Drinker's 11/1/01 report states that the 9/18/01 x-ray demonstrates a small osteophyte on the left knee. It was his impression that her symptoms represented chronic patellar tendonitis which had improved with weight loss.

In April 2002 Ms. Leader began treating with Dr. John Corsetti who diagnosed her with bilateral patellofemoral syndrome with chondral wear. He referred her for physical therapy, attempted cortisone injections and restricted her from bent knee activities. She continued to be symptomatic for knee pain and on 10/16/02 she underwent arthroscopic exploration and repair to the right knee. Post arthroscopy she developed a DVT (deep vein thrombosis) and was treated with Coumadin. The Coumadin was ceased in February 2003. In March 2003 she began treatment at the Arthritis Treatment Center and was diagnosed with Fibromyalgia by Dr. Gray. In addition she began chiropractic treatment in September 2003 with Dr. Russell Webb.

In January 2004 Ms. Leader was involved in a motor vehicle accident where she was the restrained driver and was rear ended. She was transported to the Baystate Medical Center Emergency Room where she was diagnosed with a muscle strain.

In March of 2004 Ms. Leader underwent gastric bypass surgery. Her surgeon Dr. John D. Kaspar, notes in his 7/19/2004 report that the February 2002 accident at Wal-Mart did not lead to her obesity.

Dr. Corsetti completed a report dated 8/11/04. He lists her diagnoses as: Left and right knee patellofemoral chrondrosis and postoperative deep vein thrombosis. It was further his opinion that the fibromyalgia diagnosis was not related to the February 2002 fall and he would expect that she would continue to experience difficulty with kneeling, squatting, prolonged standing or walking, lifting and carrying.

Dr. Lani Graham completed a medical review for UNUM Provident on 5/27/04 and concluded that the support for the diagnosis of Fibromyalgia was poor, and the diagnosis of hypertension and depression were not severe enough to interfere with function. Her diagnosis of lipoma, a common benign condition, would not

2

interfere with function and the diarrhea had not resulted in weight loss or demonstrate other signs of severe impact.

Dr. Kirk H. Johnson performed a medical record review dated 11/21/2004 and it was his opinion based on a review of the records that the patient's principal underlying pre-existing problem was her obesity and long standing patellofemoral disease, not injury or trauma secondary to the fall of February 2002.

**EDUCATIONAL/VOCATIONAL ASSESSMENT:** Ms. Leader left high school in the 11th grade and later obtained a GED. She obtained a bachelors degree in Education from Westfield State in 1994. She had a Massachusetts Teacher Certificate for Intensive Special Needs issued on 8/15/94.

Her past work history is outlined below:

| 1994-1995 | Special Education Teacher | Tri-County High School Easthampton, MA |
| 1995-1997 | Special Education/Pupil Adjustment Teacher | Springfield Public Schools Springfield, MA |
| 1997-1998 1998-1999 | Special Education Teacher Essential Life Skills Teacher | Westfield Public Schools Westfield, MA |

Ms. Leader was appointed as a Special Education Teacher in September 1997 earning $ 29,881 annually, and in July 1998 she was appointed as an Essential Life Skills teacher at Westfield Middle School. Her base salary as of December 2002 was $799.52 per week.

Ms. Leader submitted a letter dated 11/22/03 to the Westfield Public Schools requesting a medical leave of absence. She has not returned to work since that time.

A job description from the Westfield Public Schools for the position of _Special Education Teacher_ dated 12/7/00 lists the following as the responsibilities of the position:
- Teaches pupils utilizing course of study adopted by the Westfield Public Schools and appropriate curriculum publications as guidelines in teaching individual course content.
- Build trust and confidence with students.
- Plan curriculum, lessons, and special education programs and teaching methods.

- Maintain the physical environment of the classroom for organization and presentation purposes, Encourage good citizenship.
- Instruct individuals and groups on special education skill areas.
- Work with individual students in providing educational experiences designed to help in the achievement of student specific goals.
- Assist other professionals in resolving psychological, social, academic and disciplinary problems of students.
- Assist in screening, evaluating, and recommending placement of students in the program.
- Supervise students in and out of classroom activities during the school day.
- Provide appropriate direction for the facilitation of mainstreaming.
- Assist in the development and implementation of the Individual Education Plan.
- Monitor student progress outside the classroom.
- Maintain contact with parents of students.
- Evaluate student progress based on work output and observation, determines, goals, objectives and directions.
- Prepare report cards, education records, IEP forms, classroom observation records and other forms.
- Administer testing evaluation
- Participate in IEP meetings.
- Perform any other duties that may be assigned by the building principal or the Superintendent of Schools.

Ms. Leader's occupation as a Special Education Teacher is classified as a skilled position with light physical demands. A description by the U.S. Department of Labor, **Dictionary of Occupational Titles** follows:

### 094.227-022  SPECIAL EDUCATION TEACHER
Teaches basic academic and living skills to special education students in schools and other institutions: Plans curriculum and prepares lessons and other instructional materials to meet individual needs of students, considering state and school requirements and such factors as the students physical, emotional, and educational levels of development. Confers with parents, administrators, testing specialists, social workers, and others to develop individual educational program for students who are at different learning ability levels. Instructs students in academic subjects and social interaction skills utilizing various teaching techniques. Instructs students in daily living skills required for independent maintenance and economic self-sufficiency. Observes, evaluates, and prepares reports on progress of students. Meets with parents to provide support and guidance in using community resources.

4

May administer and interpret results of ability and achievement tests. May be required to hold state certification.

**STRENGTH**: Light, Exert force of 20 lbs. occasionally, 10 lbs. frequently, or negligible force constantly.
**SPECIFIC VOCATIONAL PREPARATION**: (Education, Training, and/or Experience) SVP = 7, Skilled - From two to four years.

**ADDITIONAL INFORMATION**: Teachers-Special Education
DATA SOURCE: U.S. Dept. of Labor - Occupational Outlook Handbook [2004-2005] Page: 236

Excellent job prospects are expected due to rising enrollments of special education students and reported shortages of qualified teachers.

Special education teachers help to develop an Individualized Education Program (IEP) for each special education student. The IEP sets personalized goals for each student and is tailored to the student's individual learning style and ability. The program includes a transition plan outlining specific steps to prepare special education students for middle school or high school or, in the case of older students, a job or postsecondary study. Teachers review the IEP with the student's parents, school administrators, and, often, the student's general education teacher. Teachers work closely with parents to inform them of their child's progress and suggest techniques to promote learning at home.

Special education teachers design and teach appropriate curricula, assign work geared toward each student's ability, and grade papers and homework assignments. They are involved in the students' behavioral and academic development, helping the students develop emotionally, feel comfortable in social situations, and be aware of socially acceptable behavior. Preparing special education students for daily life after graduation also is an important aspect of the job. Teachers provide students with career counseling or help them learn routine skills, such as balancing a checkbook.

As schools become more inclusive, special education teachers and general education teachers are increasingly working together in general education classrooms. Special education teachers help general educators adapt curriculum materials and teaching techniques to meet the needs of students with disabilities. They coordinate the work of teachers, teacher assistants, and related personnel, such as therapists and social workers, to meet the requirements of inclusive special education programs. A large

part of a special education teacher's job involves interacting with others. Special education teachers communicate frequently with parents, social workers, school psychologists, occupational and physical therapists, school administrators, and other teachers.

Special education teachers work in a variety of settings. Some have their own classrooms and teach only special education students; others work as special education resource teachers and offer individualized help to students in general education classrooms; still others teach together with general education teachers in classes composed of both general and special education students. Some teachers work with special education students for several hours a day in a resource room, separate from their general education classroom.

Mean wages for Special Education Teachers in Massachusetts were $45,920 according to USDOL; *2003 MA State Occupational Employment and Wage Estimates.*

**VOCATIONAL PROFILE:** At the time of the February 2002 incident Ms. Leader was employed in a Light, Skilled occupation as a Special Education Teacher earning $ 747.17 per week. She was out of work for two weeks and then on vacation for one weeks at which time she returned to her prior occupation at her prior earning capacity. After returning to work she continued to complain of knee pain but remained at work through October 2002. She underwent arthroscopic repair to the right knee in October 2002 and then developed a deep vein thrombosis requiring Coumadin therapy through February 2003.

Ms. Leader's treating orthopedic surgeon, Dr. Corsetti states that he would expect that Ms. Leader would continue to experience difficulty with kneeling, squatting, prolonged standing or walking, lifting and carrying. Based on these limitations, she would not be prohibited from performing the essential functions of her past light work as a special education teacher for the Westfield Public Schools or as a special education teacher in the general labor market.

**SUMMARY:** Based upon my knowledge of the facts and circumstances of this case; my review of the information and documents referenced herein; my background, experience and expertise in the field of vocational rehabilitation; the application of methodology used in the field of vocational rehabilitation to the facts and circumstances of this case, it is my opinion to a reasonable degree of vocational certainty that:

6

1.    Assuming Ms. Leader was capable of returning to light work as of February 2003 when the Coumadin therapy ceased, she would have been eligible to return to her prior position as a Special Education Teacher at her prior earning capacity. Lost wages would have been limited to the two weeks after the incident in February 2002 and then the closed period when she out of work from October 2002 when she underwent the arthroscopic repair to the right knee until she completed the Coumadin therapy in February 2003.;

2.    Michele Leader's permanent physical impairments as outlined by her treating physician Dr. Corsetti on 8/11/04 would not prohibit her from performing the essential functions of her past occupation as a Special Education Teacher.;

3.    Assuming Ms. Leader vocational disability is not related to the February 2002 incident as opined by Dr. Johnson, there would not be a loss of access to the labor market or reduced earning capacity related to the 2/1/02 incident at Wal-Mart .;

My opinions herein are in part based upon a review of the following information and documents:

1.    Deposition of Michele Leader dated 7/13/2004;

2.    Deposition of Lance Leader dated 7/13/2004;

3.    Deposition of Lance Leader dated 7/13/2004;

4.    Documents from Westfield Public Schools;

5.    Medical records of Dr. Kirk H. Johnson;

6.    Medical records of Dr. Henry Drinker;

7.    Medical records of Dr. John  R. Corsetti;

8.    Medical records of Dr. John D. Kasper;

9.    Medical records from Noble Hospital;

10.    Medical records from Bay State Medical Associates;

11.    Medical records from Dr. Armand Aliotta;

12.    Medical records from Hampden County Physician Associates;

13.    Medical records from Physical Therapy Partners;

14. Medical records from Vascular Services of Western New England;

15. Medical records from Russell Webb DC;

16. Medical records from Pioneer Valley Medical Center/Family Medicine Associates;

17. Medical records from New England Orthopedic Surgeons;

18. Medical records from Bay State Medical Center;

19. Medical records from Dr. Donald Goldenberg;

20. Records from American Medical Response;

21. Medical Records from the Arthritis Treatment Center;

22. Medical Records from Hampshire Orthopedics and Sports;

23. Records from the UNUM Provident regarding Ms. Leader's Long Term Disability Benefits.

My curriculum vitae is attached in Exhibit 1.

A list of other cases that I have provided testimony in are attached hereto in Exhibit 2.

In addition, my professional hourly rate is $125 per hour and I have received a $1000 retainer from, Craig and Macauley. The mileage rate is 40.5 cents per mile and testimony/deposition rate is $150 per hour with a 4 hour minimum.

I reserve the right to supplement the opinions expressed herein.

If you have any questions, or if I can provide you with any additional information, please feel free to contact me.

Respectfully submitted,

Amy E. Vercillo, M.S., L.R.C., C.R.C., C.D.M.S.
Vocational Counselor/Manager

*R* **Rehabilitation and**

*R* **Re-Employment** *inc.*

115 Cedar Street • Providence RI 02093-1035

(401)272-4552  •  (401)331-4336 fax

New England Regional Office                    1-800-294-5323

**PROFESSIONAL PROFILE**

# AMY E.VERCILLO M.S.,C.R.C., C.D.M.S., L.R.C.

EDUCATION AND CERTIFICATIONS

1994    Vocational Expert, Social Security Office of Hearings and Appeals
1993    ScD. Candidate,Rehabilitation, ABD, Boston University
1991    Licensed Rehabilitation Counselor (L.R.C.)
1986    Certified, U.S.Department of Labor, Workers' Compensation
1985    Certified Disability Management Specialist (C.D.M.S.)
1984    Certified Rehabilitation Counselor (C.R.C.)
1984    M.S., Rehabilitation Counseling, Boston University
1983    B.S., Rehabilitation Services, Boston University

GOVERNMENT APPOINTMENTS

1988    Selected by USDOL for Pilot Rehabilitation Study

1990- Governor's Advisory Council on Workers' Compensation
1997    Appointed to a five year position as the Rehabilitation Representative on the 14 member
        Advisory Council. Responsibilities include: oversight of the MA Dept. of    Industrial
        Accidents, review of judicial nominations, review and approval of 16 million dollar operating budget, review and report
        on all legislation regarding Workers' Compensation, review and analysis of insurance rate filings, develop and procure
        research studies on  Workers' Compensation System and report to MA legislature.

TRAINING PUBLICATIONS AND SEMINARS

1983    Placement of the Ex-Offender Department of Corrections, Boston, MA
1987    Publication: Re-employment of the Head Injured Client, HEADLINES
1989    Speaker:  MA Head Injury: "Insurance and Head Injury Rehabilitation"
1990    Speaker: Whittier Rehab. Hospital: "Vocational Rehabilitation Implications in the Workers' Compensation System"
1990    Speaker: New Medico Head Injury System: "Brain Injury  and the  Compensation Carrier: Realistic Expectations  for
        Difficult Cases"
1990    Speaker: New Medico Head Injury System: "Marketing to Referral Sources"
1991    Speaker: PRO-MASS: "Employment Services and ADA"
1991    Speaker: MA Head Injury: "Private Health Care Policy Coverage"
1992    Speaker: MA Risk and Insurance Management Society: "ADA and Workers' Compensation Carrier"
1993    Speaker: Boston University: "National Health Care Reform and Workers' Compensation"
1994    Speaker: MA Rehabilitation Commission: "Ethical Issues in Rehabilitation"
1994    Speaker: MA Academy of Trial Lawyers: "Use of the Vocational Expert"

PROFESSIONAL EXPERIENCE

1986-    Rehabilitation and Re-Employment, Inc.          Boston, MA/ Providence RI
Present            Manager of Private Rehabilitation Agency.

Supervised a staff of Rehabilitation Nurses, Vocational Counselors, Employment Specialists, Marketing
Representative and Clerical Staff.

1983-   IMARC/Crawford Risk Management                Braintree, MA
1985          Vocational Rehabilitation Counselor for disabled clients receiving Workers' Compensation
1982-   Boston Employment Resource Center             Boston, MA
              Vocational Rehabilitation Counselor for special needs parolees

1987-   CLINICAL AGENCY SUPERVISOR
1996          Provided clinical supervision to graduate Rehabilitation Counseling students at Boston University

1993-   ADJUNCT INSTRUCTOR
Present      Instructor in the Rehabilitation Counseling Department at Boston University for
              undergraduates and graduate students

## PROFESSIONAL AFFILIATIONS

1987 to   National Association of Rehabilitation Providers in the Private Sector
Present          NE Legislative Chair, 1987-1989, 1994-1996 ,MA Regulatory Chair, 1987-1989

1994 to   National Association of Rehabilitation Educators
Present

1990-93   Rehabilitation Professionals of Massachusetts, Co-Chairperson

## EXPERT TESTIMONY

Qualified as a Vocational Rehabilitation Expert in MA  District and Superior Courts,
US Federal Court, Social Security and MA Department of Industrial Accidents

# TESTIMONY LIST  FOR AMY E.VERCILLO C.R.C., C.D.M.S., L.R.C.

| DATE | NAME | ATTORNEY/ | COURT | SERVICE |
|------|------|-----------|-------|---------|
| 2/00 | HASSETT, Gary | Callinan,Christopher | US District Court | Deposition |
| 4/00 | FISHER, Toby | Hinton, Robert | US Federal Court | Deposition |
| 7/00 | ROBERTS, Anthony | Elly, Peter | Suffolk Superior | Deposition |
| 12/00 | FISHER, Danielle | Robert Costello | Middlesex Superior | Testimony |
| 01/01 | GATH,Jeffrey | James Franchek | Middlesex Superior | Testimony |
| 12/01 | KHIM, Saroeuth | John Pinheiro | Hartford Superior | Deposition |
| 01/02 | BOYAZIAN, Michael | David Hill | Hartford Superior | Deposition |
| 06/02 | DILLION, Edward | Jospeh DeFillipo | Hartford Superior | Testimony |
| 09/02 | LAKEY-SMITH, Betty | Robert Clark | Providence Superior | Deposition |
| 03/03 | DICARLO, Jean | Allan Bernstein | Salem Probate | Testimony |
| 9/03 | GERACE, Robert | Richard Tynan | Hartford Superior | Testimony |
| 12/03 | KEILER, Mark | John Donovan | Essex Superior | Testimony |
| 05/04 | GOODRICH, George | Elizabeth Mulvey | Suffolk Superior | Testimony |
| 08/04 | FORTIER, Mark | Mike Palmieri | Hamden Superior | Deposition |
| 10/04 | JOHNSON, Timothy | David Suchecki | Suffolk Superior | Deposition |
| 2/05 | NOCERO, Michael | Mark Shapiro | US Federal | Deposition |
| 3/05 | SANSONE, Ralph | Carl Fickes | New Haven Superior Court | Deposition |
| 4/05 | SMITH, Valerie | John Bonistalli | Middlesex Superior | Testimony |
| 4/05 | WRIGHT, David | Anton Geidt | US Federal | Testimony |

**THOMAS P. GOSS, MD**

Independent **Orthopaedic**
Examinations **& Opinions**

Professor of Orthopaedic Surgery
Member: AAOS: AOA: ASES: OTA
Diplomate: American Board of Orthopaedic Surgery

e-mail:gosst@ummhc.org

June 13, 2005

RE: LEADER, MICHELLE

To Whom It May Concern:

The following is an independent medical evaluation relative to Ms. Michelle Leader. I am an orthopedic surgeon licensed within the Commonwealth of Massachusetts and I performed this evaluation on 6/10/05.

Ms. Leader is a young (D.O.B.: 1/12/68) adult female who was seen by Dr. Drinker (an orthopedic surgeon) on 11/1/01. At that time she was complaining of left knee discomfort. He observed that "in February of this year she fell directly onto the front of her left knee and describes a significant contusion extending from the distal pole of the patella to the tibial tubercle with ecchymosis and swelling". X-rays of the left knee obtained at the Noble Hospital showed a "small osteophyte at the insertion of the quadriceps tendon". Dr. Drinker's diagnosis was that of "chronic patellar tendon insertional tendinitis, probably initially stimulated by a direct contusion and aggravated, of course, by the additional strain absorbed by that structure". Nonoperative care was recommended. The patient was seen by Mr. Pirola (a physician's assistant) at the Noble Hospital on 2/1/02. He observed that "while at Wal-Mart she tripped over the rug, falling forward and landing on both knees". X-rays of both knees were unremarkable. Mr. Pirola's diagnosis was that of "contusion/abrasion, bilateral knees". The patient was then seen by Dr. Drinker on 2/4/02. His diagnosis was that of "contusion, both knees". He felt that "because of her obesity and her pre-existing tendinitis this is going to take a number of weeks to resolve". The patient was seen by Dr. Corsetti on 4/29/02. He indicated that the patient's bilateral anterior knee pain had been "present for the past several years…she has had several falls onto the knees and feels this may be the cause of her problem". On physical examination he noted that Ms. Leader weighed 250 pounds and had "full motion bilaterally with dense PF crepitus on range of motion testing". His diagnosis was that of "PF syndrome with \

RE: LEADER, MICHELLE
PAGE 2 OF 8

chondral breakdown in an obese woman". He felt that "given her size…as well as the fact that she already has advanced chondral breakdown on exam, somewhat pessimistic that she is going to do well and may require arthroscopy for smoothing the undersurface of the kneecaps bilaterally". On 9/9/02 Dr. Corsetti noted that the patient was "complaining of right greater than left severe anterior knee pain with crepitus…the knee has acted up upon return to school as a teacher this year". An MRI of the right knee was performed on 9/12/02 and was unremarkable. On 10/16/02 Dr. Corsetti took the patient to the operating room and performed a "patellar chondroplasty" for a postoperative diagnosis of "grade III-IV chondral wear, lateral facet of patella". In his admission note, Dr. Corsetti stated that the patient had a "long history of refractory right anterior knee pain and crepitus and has failed conservative measures". Unfortunately, the patient developed a DVT postoperative requiring anticoagulation therapy. Dr. Corsetti continued to follow the patient on an outpatient basis. On 2/25/02 Dr. Corsetti observed that the patient had "multiple constitutional symptoms including severe migraines, upper extremity pains, lower extremity pains separate from the knee…she was also complaining of a lot of persistent calf pain…whole body pain develops". The patient was seen by Dr. Gray on 3/18/03 whose diagnoses included "fibromyalgia, active, poorly controlled" and "patellofemoral arthralgia/chondromalacia, right". On 4/1/03 Dr. Corsetti noted Dr. Gray's diagnosis of fibromyalgia and indicated that the patient felt "tremendous pain throughout her body". He recommended "followup with Dr. Gray, continued treatment for what appears to be a full blown fibromyalgia, told her that I certainly thought any further surgery on either knee would not be in her best interest with which she agreed…I will see her back in my office p.r.n. should any significant change in her orthopedic status occur". On 4/16/03 Dr. Gray included the diagnosis of "patellofemoral osteoarthritis, left knee". The patient was evaluated by Dr. Goldenburg on 7/16/03. He agreed with the diagnosis of fibromyalgia. Dr. Pierangelo also felt that the patient was suffering from fibromyalgia. An independent review of medical records was performed by Dr. Kirk Johnson (an orthopedist) on 11/21/04. He summarized the patient's course. He noted that "on September 13, 2001 primary care

RE: LEADER, MICHELLE
PAGE 3 OF 8

note indicates the patient's weight is 256 pounds…the
primary complaints at the time of this visit are need for
medications relative to question sinus infection and left
knee pain…the history provided includes a history of a fall
on the left knee in February 2001 (seven months previous)
with complaints of intermittent pain and a lump…diagnosis
left knee pain". Dr. Johnson then went on to state that
"one month later Michelle Leader presents to primary care
to discuss the x-ray of the left knee with complaints of
continued tenderness especially when standing for long
periods of time…examining physician records a lump in the
lateral left knee and also records the osteophyte revealed
by the x-ray with recommendation of orthopedic referral".
Dr. Johnson went on to state that "on August 11, 2004 Dr.
Corsetti writes to Attorney John McCarthy regarding his
care of Michelle Leader…in this note he confirms that the
patient described an onset of left knee pain in February
2001 and an injury to both knees in February 2002…he goes
on to describe his examination of the patient from the
point of her initial presentation to him in April 2002
including cortisone injections and subsequent
arthroscopy…he describes his arthroscopic findings,
subsequent development of deep venous thrombosis, and
complications of that syndrome…he goes on to further
describe the patient's treatment with Dr. Gray regarding
the patient's fibromyalgia…he concludes a diagnosis of left
knee patellofemoral chondrosis, right knee patellofemoral
chondrosis, and postoperative deep venous thrombosis…he
states in a paragraph titled causality that the fall of
February 2002 is a major causal factor with reference to
the patient's knee complaints…he does indicate the
likelihood of pre-existing disease necessitating cortisone
injections and recognizing the complaints following the
injury of February 2001…furthermore, he states that had the
patient not fallen, it is unlikely that the patient would
have required medical care and surgery on her right knee…he
finally concludes that the injury of February 2002 is the
major contributor of her ongoing clinical syndrome…he
finally concludes, based upon the patient's history and
examination, a 10% permanent loss of function in each lower
extremity on the basis of the injuries described". Dr.
Johnson then states that the patient's "history of obesity
is well established…Michelle Leader first complained of

knee pain in September of 2001, describing a fall several months earlier…just two-and-a-half months after the patient's February 2002 fall, Dr. Corsetti evaluates the patient observing pain present for several years/several falls…he notes bilateral crepitus, radiographic evidence of patellofemoral alignment, and concludes patellofemoral syndrome with chondral breakdown in an obese woman…he further states that given her size, she already has advanced chondral breakdown…in essence he concludes a poor prognosis in light of her obesity and clear evidence of advanced disease". Dr. Johnson went on to state that "on October 22, Dr. Corsetti again reiterates that the patient is being brought to the operating room with a long history of refractory anterior knee pain and crepitus that has failed conservative management…at the time of arthroscopy he describes grade III-IV chondral wear". Dr. Johnson concluded that "Dr. Corsetti's assessment at the time of his first treatment of the patient is not consistent with his assessment in his letter of August 11, 2004…in the face of the findings of stage III-IV articular change, it is inconsistent to state that had this fall not occurred, it is unlikely that the patient would have required medical care and surgery on her right knee…based upon review of records there is ample documentation that the patient's principle underlying pre-existent problem was her obesity and longstanding patellofemoral disease, not injury or trauma secondary to the fall of February 2002".

When I saw Ms. Leader on 6/10/05 she told me that she was continuing to experience bilateral knee pain, left more than right. She said that the right knee had improved since her surgery. She said her discomfort is constant and located anteriorly. She is bothered especially by bending activities. She cannot run. She can only walk a block at a time before resting. She has to use a cane to ambulate. She has difficulty negotiating stairs. Symptoms are localized to her knees. Again, the left bothers her more than the right. In terms of treatment, she is currently seeing a rheumatologist and a pain management physician for overall management. She has not seen Dr. Corsetti since 2003 but is due to see him again next week. In terms of treatment she has had no injections into the right knee since her surgery. She has, however, had five injections into her

RE: LEADER, MICHELLE
PAGE 5 OF 8


left knee. The one aforementioned surgical procedure has
been performed. She takes Celebrex for its anti-
inflammatory effect. No therapy has been prescribed
recently. She uses a cane to ambulate at all times. She
also makes use of knee supports as need be. In terms of
objective diagnostic studies, she has had the
aforementioned routine radiographs of her knees as well as
an MRI of her right knee. At the time of her injury she was
not on the job although she was doing some shopping at Wal-
Mart for work-related activities. Her occupation was that
of a Special Ed teacher which does involve heavy,
repetitive activities. Following the event of 2/1/02, she
remained out of work for a month and then returned to work
on a self-limited basis. She had the summer of 2002 off and
then returned to work in September for a month-and-a-half
on again a self-limited basis before leaving her employment
due to unacceptable knee discomfort. She has not returned
to the work force.

As we talked I observed a mildly overweight young adult
female (D.O.B.: 1/12/68) who sat in no apparent distress.
When asked to stand and ambulate, however, she did so
tentatively and walked with a bilaterally antalgic gait.
Both knees came out into full extension and flexed to 110
degrees. She had discomfort at the extremes of flexion.
Gentle range of motion was fairly smooth. No knee joint
effusions were noted. Ligaments were stable in all
directions. Both knees were diffusely tender to palpation
but especially the left knee. No abnormalities to palpation
were noted. Well-healed arthroscopy scars were noted over
the right knee. She had a normal distal neurovascular
check. No additional objective diagnostic studies were
available to me.

COMMENTS AND CONCLUSIONS:
   1)  DIAGNOSIS: A young adult female who sustained what
       appears to have been minor soft tissue injuries to
       both of her knees at the time of a fall on 2/1/02 in
       the face of significant pre-existing degenerative
       disease involving her patellofemoral articulations.
       No hard objective evidence of more significant
       musculoskeletal pathology that can be related to this
       event has been identified and I found no evidence of

RE: LEADER, MICHELLE
PAGE 6 OF 8

neurovascular impairment. Ms. Leader continues to describe persistent bilateral knee discomfort/ dysfunction which I believe is due to the aforementioned pre-existing pathology within the articulations.

2) CAUSAL RELATIONSHIP: Since it would appear that at the time of the event of 2/1/02 Ms. Leader sustained relatively minor soft tissue injuries to her knees and since such injuries heal fairly reliably in 4-6 weeks, I find it difficult to relate symptomatology experienced after mid-March 2002 to this event. Rather, I believe her subsequent bilateral knee difficulties have been due to the aforementioned significant degenerative disease involving the patellofemoral articulations. This opinion regarding significant pre-existing patellofemoral degenerative disease is based upon 1) the note by Dr. Drinker dated 1/11/01 describing anterior left knee symptomatology since a fall in February 2001; 2) Dr. Corsetti's description on 4/29/02 of "bilateral anterior knee pain present for the past several years…she has had several falls onto the knees and feels this may be the cause of her problems"; 3) Dr. Corsetti's description in the same note of "dense PF crepitus on range of motion testing as well as his impression of PF syndrome with advanced chondral breakdown in an obese woman; and 4) his description of "grade III-IV chondral wear, lateral facet patella" in his 10/16/02 operative report.

3) TREATMENT (? APPROPRIATE): All of the treatment Ms. Leader received following the event of 2/1/02 including the arthroscopic procedure performed by Dr. Corsetti on 10/16/02 appears to have been quite appropriate.

4) FURTHER EVALUATION/FUTURE TREATMENT: Ms. Leader underwent a satisfactory diagnostic evaluation of the injuries she sustained on 2/1/02 including routine radiographs of both articulations, an MRI of her right knee, an evaluation by an orthopedic surgeon, and an arthroscopic visualization of the interior of

RE: LEADER, MICHELLE
PAGE 7 OF 8

her right knee. I believe no further diagnostic
evaluation was indicated since these studies/this
evaluation failed to reveal hard objective evidence
of significant pathology that could be related to the
2/1/02 event but, rather, revealed the source of her
persistent bilateral knee discomfort, namely, pre-
existing degenerative disease involving the
patellofemoral articulations. In addition, since
minor injuries such as Ms. Leader apparently
sustained to her knees on 2/1/02 resolve fairly
reliably in 4—6 weeks, I find it difficult to justify
active medical care for these injuries after mid-
March 2002 nor would any future treatment related to
this event be anticipated.

5) MAXIMAL MEDICAL RESULT: Since it would appear that at
the time of the event of 2/1/02 Ms. Leader sustained
relatively minor injuries to both of her knees and
since such injuries heal fairly reliably in 4—6
weeks, it is my opinion that Ms. Leader realized her
maximal medical result as regards this event by mid-
March 2002.

6) RETURN TO WORK/RESTRICTIONS/DISABILITY: Since it
would appear that at the time of the event of 2/1/02
Ms. Leader sustained relatively minor injuries to her
knees and since such injuries heal fairly reliably in
4—6 weeks, it is my opinion that Ms. Leader was
capable of returning to her pre-injury status with no
restrictions and no lasting disability assigned to
the 2/1/02 event by mid-March 2002. A period of
partial disability during this time, however, would
be appropriate to allow her to recover sufficiently.
In view of the significant pre-existing
patellofemoral degenerative disease involving both of
her knees, however, Ms. Leader would be well advised
to permanently avoid occupational/avocational duties
which involve the application of significant and/or
repetitive loading, bending, and/or twisting stresses
upon the articulations. Kneeling activities would
also be particularly difficult.

RE: LEADER, MICHELLE
PAGE 8 OF 8

7) There is hard objective evidence of significant pathology involving both of Ms. Leader's knees that was present prior to the event of 2/1/02, namely, the aforementioned information included in Dr. Drinker's letter of 11/1/01, Dr. Corsetti's office note of 4/29/02, and Dr. Corsetti's operative note of 10/16/02. It is my opinion that this pre-existing bilateral knee pathology is responsible for whatever bilateral knee discomfort/dysfunction Ms. Leader has noted since mid-March 2002 rather than the event of 2/1/02.

I hope this has been of help to you. If I can be of any further assistance, please feel free to contact me.

Sincerely,

Thomas P. Goss, M.D.

TPG/rag