UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

|  |  |
|---|---|
| MICHELE LEADER, LANCE LEADER, KURTIS LEADER, PPA LANCE LEADER,<br><br>    Plaintiffs<br><br>v.<br><br>WAL-MART STORES, INC. and WAL-MART STORES EAST, LP,<br><br>    Defendant. | Civil Action No. 04-30055-KPN |

DEFENDANT'S MOTION IN LIMINE REGARDING ALLEGED VIDEO EVIDENCE

    Defendant Wal-Mart Stores East, LP ("Wal-Mart") hereby moves this Court *in limine* for an Order prohibiting any reference to the alleged videotape evidence in this matter. As grounds therefore, Wal-Mart states as follows:

I.    BACKGROUND

    This is a negligence action in which Plaintiff Michelle Leader claims to have suffered injuries as the result of a trip and fall on February 1, 2002 at the Wal-Mart Store located in Westfield, Massachusetts. The only issue in this case is whether, under the given circumstances on the date in question, Wal-Mart exercised

reasonable care for the safety of its patrons, including the Plaintiff Michelle Leader.

Plaintiffs' counsel has alleged that Wal-Mart failed to preserve a contemporaneous surveillance videotape of Michelle Leader's alleged accident, but this contention is totally unsupported by the facts in this matter. According to Ms. Leader, her alleged accident occurred "several steps" inside the store across from the Customer Service desk. See Depo. of Michelle Leader at 27-28 (attached hereto as Exhibit 1); see also Exhibit 1 to Leader Depo. (attached hereto as Exhibit 2). Notably, however, there was no surveillance camera directed on said location at the time of the alleged accident. See Affidavit of Scott Swane (attached hereto as Exhibit 3). In fact, the nearest camera was pointing at the front entranceway and covered an area that stretched only a few feet inside store from the front door. See Depo. of Don Byram at 31 (attached hereto as Exhibit 4).

Don Byram, the former Store Manager of the Westfield Wal-Mart, has testified in deposition that the store maintained a video camera near the front entrance. See Depo. of Don Byram at 31. Notably, however, he was never asked if the Plaintiff's accident was recorded, could have been recorded, or if the place where she is alleged to have fallen would have been within the view of the camera. See Depo. of Don Byram at 31-34. Had he been asked, the

answer would most certainly have been no, no, and no. In any event, both Mr. Byram and the current Store Manager (Scott Swane) are prepared to testify that, based upon the Plaintiff's own description of the accident, her alleged trip and fall could not possibly have been recorded. See Affidavit of Scott Swane.

In short, a videotape of the Plaintiff's accident *never existed*. Nevertheless, and despite the absence of any supporting evidence, Plaintiffs have insisted throughout this litigation (and will, no doubt, attempt to insist at trial) that Wal-Mart, through its deliberate effort not to preserve the video tape of Plaintiff's accident on 02/01/02, caused the spoliation of evidence. To be sure, lacking a valid factual or legal basis for such an assertion, Plaintiffs' counsel should be forbidden from making reference to the alleged videotape evidence at trial.

## II. LEGAL ARGUMENT

The alleged video evidence and Wal-Mart's alleged spoliation of the same have no valid factual or legal basis, and any reference to video evidence or spoliation should be forbidden at trial. Notably, the Third Circuit reviewed the relevant considerations when a similar spoliation issue was raised by a party to litigation in Schmid v. Milwaukee Electric Tool Corporation, 13 F.3d 76 (3d Cir. 1994). In enunciating the rationale for the "spoliation inference",

the Schmid court quoted Judge Breyer in Nation-wide Check Corp. v. Forest Hills Distributors, Inc., 692 F.2d 214, 218 (1st Cir. 1982):

> [T]he evidentiary rationale [for the spoliation inference] is nothing more than the common sense observation that a party who has notice that [evidence] is relevant to litigation and who proceeds to destroy [evidence] is more likely to have been threatened by [that evidence] than is party in the same position who does not destroy the document.

Schmid, 13 F.3d at 78. Here, not only is there no evidence that Wal-Mart destroyed the alleged video evidence, but there is credible evidence that the alleged video evidence *never existed*. Therefore, based upon the rationale discussed in Schmid, it is clear that Wal-Mart is not guilty of spoliation when it did not have notice that certain evidence was relevant to litigation or when there was no "fault" in conjunction with the alleged missing evidence. In short, without proof that any relevant evidence existed, it would be unfair to allow Plaintiffs to argue at trial that Wal-Mart intended to impair the litigants from presenting such evidence.

III. CONCLUSION

Plaintiffs are unable to make a showing that the alleged video evidence ever existed, much less that Wal-Mart had notice of such evidence and proceeded to destroy it. Under the circumstances, no adverse inference regarding spoliation is appropriate, and it would be highly prejudicial to Wal-Mart if

Plaintiffs' counsel were permitted to make reference to the alleged video tape evidence at trial.

WHEREFORE, Defendant Wal-Mart respectfully requests that the Court issue an Order *in limine* prohibiting any reference to the alleged videotape evidence in this matter and for such other and further relief as the Court deems appropriate.

Dated: October 21, 2005                Respectfully submitted,

                                       WAL-MART STORES EAST, LP

                                       By its attorneys,

                                       CRAIG AND MACAULEY
                                        PROFESSIONAL CORPORATION

                                       _____
                                       Richard E. Quinby BBO#545641
                                       Chauncey D. Steele IV BBO#647207
                                       Craig and Macauley
                                        Professional Corporation
                                       Federal Reserve Plaza
                                       600 Atlantic Avenue
                                       Boston, Massachusetts 02210
                                       (617) 367-9500


RULE 7.1(A)(2) CERTIFICATION

I hereby certify that I conferred with Plaintiff's counsel, John J. McCarthy on October 21, 2005 and that I attempted in good faith to resolve this issue.

                                       _____
                                       Chauncey D. Steele IV

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on October 21, 2005.

_____
Chauncey D. Steele IV

Case 3:04-cv-30055-KPN    Document 42    Filed 10/24/2005    Page 7 of 19

```
         UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF MASSACHUSETTS
                WESTERN DIVISION


MICHELE LEADER, LANCE             )
LEADER, KURTIS LEADER,            )
PPA LANCE LEADER,                 )
                  Plaintiff       )
vs.                               )
                                  )
WAL-MART STORES, INC.,            )
                  Defendant       )
```

DEPOSITION OF MICHELE LEADER, taken on behalf of the Defendant, pursuant to the Federal Rules of Civil Procedure, before Linda Horne, Registered Professional Reporter No. 114593 and Notary Public within and for the Commonwealth of Massachusetts, at the offices of Doherty, Wallace, Pillsbury, and Murphy, P.C., One Monarch Place, 1414 Main Street, Springfield, Massachusetts, commencing at 10:39 a.m. on Tuesday, July 13, 2004.

G & M/HOEY COURT REPORTERS, LTD.
(617) 338-0030

Page 2

1  APPEARANCES:
2
3  DOHERTY, WALLACE, PILLSBURY & MURPHY, P.C.
4      (By John M. McCarthy, Esq.)
5      One Monarch Place
6      1414 Main Street, 19th Floor
7      Springfield, MA 01144
8          On behalf of the Plaintiff
9
10
11  CRAIG AND MACAULEY
12      (By Chauncey D. Steele, IV, Esq.)
13      Federal Reserve Plaza
14      600 Atlantic Avenue
15      Boston, MA 02210
16          On behalf of the Defendant
17
18  ALSO PRESENT:
19  THOMAS DAY, ESQ.
20  LANCE LEADER
21
22
23
24

Page 3

1              I N D E X
2
3  WITNESS                           PAGE
4
5  MICHELE LEADER
6
7      Examination by Mr. Steele     4
8      Examination by Mr. McCarthy   68
9
10
11
12
13
14
15          E X H I B I T S
16
17  NO.    DESCRIPTION               PAGE
18
19  1      Diagram                   29
20
21      EXHIBIT RETAINED BY ATTORNEY STEELE
22
23
24

Page 4

1              P R O C E E D I N G S
2          MR. STEELE: Good morning. John,
3      can we agree to the usual stipulations?
4          MR. MCCARTHY: Sure. She will
5      read and sign.
6          MR. STEELE: Okay. Counsel and I
7      have agreed the usual stipulations will
8      apply for the deposition. All objections,
9      except as to the form of the question and
10     all motions to strike and non-responsive
11     answers, will be reserved until the time
12     of trial.
13         The witness will exercise her right
14     to read and sign the transcript. Waive
15     notary.
16         MR. MCCARTHY: Yes.
17         MICHELE LEADER, Deponent, having
18     first been duly sworn, deposes and states
19     as follows:
20                * * * * *
21     EXAMINATION BY MR. STEELE:
22  Q. Could you please state your full name for
23     the record?
24  A. Michele Ann Leader.

Page 5

1  Q. Ms. Leader, my name is Chad Steele. I'm
2      an attorney representing Wal-Mart stores
3      in the lawsuit that you've brought against
4      Wal-Mart stores that is currently pending
5      in the United States District Court for
6      the District of Massachusetts, Western
7      Division.
8          We are taking your deposition today
9      in this matter under the Federal Rules of
10     Procedure. I'm sure your attorney has
11     told you that this is a discovery tool
12     that's a way for my client to find out
13     about you and about your version of the
14     events that give rise to this lawsuit.
15         Do you understand that?
16  A. Yes, I do.
17  Q. The court reporter here is going to
18     prepare a transcript of everything that is
19     said today, my questions, your answers.
20     When all is said and done, the transcript
21     can be used in a number of ways, not the
22     least of which would be to compare what
23     you say today to what you say at the trial
24     in this matter.

Page 6

```
 1       Do you understand that?
 2  A.  Yes.
 3  Q.  I'll try to speak slowly and clearly. If
 4      at any time you don't understand something
 5      I am saying, will you please tell me?
 6  A.  Okay.
 7  Q.  Thank you. I'm sure your attorney told
 8      you gestures and head shakes and nods
 9      cannot be recorded by the stenographer, so
10      we would all appreciate it if you would
11      speak rather than gesture.
12  A.  Okay.
13  Q.  Thank you. Do you go by any other names
14      other than Michele Leader?
15  A.  No.
16  Q.  Are there any medications you've taken
17      today that might affect your ability to
18      understand me?
19  A.  I mean, I take medications daily. I don't
20      feel that anything is going to affect me
21      so that I don't understand what the
22      questions are.
23  Q.  Can you understand me so far?
24  A.  Yeah.
```

Page 7

```
 1  Q.  Other than speaking with your attorneys,
 2      what have you done to prepare for the
 3      deposition today?
 4  A.  What have I done? Nothing, really.
 5  Q.  Have you spoke with your husband?
 6  A.  He came with me to the first appointment
 7      with the attorneys about what was going to
 8      happen here.
 9  Q.  Was he with you on the date of the
10      accident that gives rise to the lawsuit?
11  A.  He was with me after the accident. He
12      came to pick me up at Wal-Mart.
13  Q.  He wasn't with you when the accident
14      occurred?
15  A.  No.
16  Q.  We'll talk to him later.
17         What is your current address, Mrs.
18      Leader?
19  A.  172 Holyoke Road, Westfield,
20      Massachusetts, 01085.
21  Q.  What is your Social Security number?
22  A.  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.
23  Q.  What is your date of birth?
24  A.  January 12, 1968.
```

Page 8

```
 1  Q.  How long have you lived at your current
 2      address?
 3  A.  Nine years, I think, something like that.
 4  Q.  Do you live there with your husband?
 5  A.  Yes.
 6  Q.  How long have you been married to him?
 7  A.  It will be three years in August.
 8  Q.  Were you married to someone else before
 9      that?
10  A.  No. We've always been together. We just
11      recently got married.
12  Q.  Do you have any children?
13  A.  Yes.
14  Q.  How many?
15  A.  One.
16  Q.  What is his name?
17  A.  Kurtis with a "K".
18  Q.  The same Kurtis Leader that's a plaintiff
19      in this lawsuit?
20  A.  Yes.
21  Q.  How old is Kurtis?
22  A.  He's 18.
23  Q.  Was he with you on the date of the
24      accident that brings us here today?
```

Page 9

```
 1  A.  No.
 2  Q.  Does he live in your home?
 3  A.  Yes, he does.
 4  Q.  Is he attending college?
 5  A.  No, he isn't.
 6  Q.  Does he work?
 7  A.  No.
 8  Q.  Is he in high school?
 9  A.  No.
10  Q.  What does he do?
11  A.  He dropped out of high school and is
12      preparing for his GED.
13  Q.  Did you graduate from high school?
14  A.  No.
15  Q.  What is the furthest level of education
16      that you obtained?
17  A.  College degree, bachelors.
18  Q.  You got your GED?
19  A.  Yes.
20  Q.  Did you ever attend high school?
21  A.  Yes, I did.
22  Q.  Where?
23  A.  Westfield High.
24  Q.  How far did you get?
```

Page 10

1  A. Tenth grade. I completed 10th grade and a
2     little into 11th, but I didn't complete
3     11th.
4  Q. Why did you leave high school?
5  A. I was pregnant.
6  Q. With Kurtis?
7  A. Yes.
8  Q. At some point, did you complete high
9     school?
10 A. I got my GED.
11 Q. You did that from home?
12 A. No, I mean, not from home. I took classes
13    called Prime Time. It was a job core
14    facility.
15 Q. In Springfield?
16 A. In Chicopee. It was made for people that
17    had -- I was working during the day, and I
18    was attending classes at night and
19    learning computers, so it was other skills
20    that I was learning at the same time.
21 Q. When did you receive your GED?
22 A. 1987. I'm pretty sure. I'm not exact but
23    I'm pretty sure that's around the time.
24 Q. When did you attend college?

Page 11

1  A. From 1990 to '93.
2  Q. Where was that?
3  A. Westfield State College.
4  Q. You graduated?
5  A. Yes, I did.
6  Q. What was your degree?
7  A. Special education.
8  Q. What was the first job that you obtained
9     after you graduated?
10 A. I worked at Tri-County High School in East
11    Hampton. It's a private school for
12    students with severe behavioral disorders.
13 Q. What was your position there?
14 A. Special education teacher.
15 Q. What was your salary there?
16 A. Twenty-two thousand.
17 Q. How long did you work at Tri-County High
18    School?
19 A. Well, it was about from January of '94 to
20    August of '95. It was about a year and a
21    half or so, give or take.
22       I taught during the summer the first
23    year as well because the program runs
24    straight through the summer. It was kind

Page 12

1     of, like, you didn't have to but if you
2     wanted to, you could work through the
3     summer so I did.
4  Q. When you were working through the summer,
5     were you still receiving a paycheck?
6  A. Yes, it's a separate paycheck. So I
7     probably made -- I was probably wrong --
8     because I probably made another 2,000, I
9     would say, something like that over the
10    summer.
11 Q. I was just curious as to how they are
12    paid, teachers that work over the summer.
13 A. It's separate.
14 Q. And after Tri-County High School, what was
15    the next job that you had after that?
16 A. It was Central High Academy in
17    Springfield.
18 Q. Were you a special education teacher
19    there, as well?
20 A. Yes, I was.
21 Q. How long were you there for?
22 A. Two years.
23 Q. So from the fall of '95 through the spring
24    of '98?

Page 13

1  A. No. I said two years, '95, '96, '97,
2     right. I think '95, '96, to '97, yeah.
3  Q. What salary were you receiving there?
4  A. During the course of it, somewhere around
5     29 to -- yeah, 29,000, I think it was,
6     maybe 27. I'm really not quite sure. It
7     was a significant raise from going from
8     private to public so maybe 27. I'm not
9     sure about that.
10 Q. What about after Central High Academy?
11 A. I went to Westfield.
12 Q. Westfield High School?
13 A. No. It was called East Mountain Road
14    School in Westfield, and it wasn't part of
15    the public -- it was under the public
16    domain, but it wasn't part of a public
17    school, like an elementary school or a
18    high school. It was a separate school
19    they just started that year.
20       I was the lead teacher there that
21    helped start the program, and it was for
22    emotionally disturbed kids, behavioral
23    disorders, cognitive disorders. So there
24    were kind of dual disabilities.

Page 14

1  Q. So you started there in the fall of '97?
2  A. Yes.
3  Q. How long did you stay there for?
4  A. I think I was only there for a year. I'm
5     trying to remember. Yeah, I think it was
6     a year because that's -- then my -- yeah,
7     it was a year. My special ed director
8     came to me around the end of school and
9     asked me to consider transferring to the
10    middle school because they needed help
11    there.
12 Q. That's Westfield Middle School?
13 A. Yeah, Westfield Middle School at the time.
14    It's now called South Middle. They've
15    opened up two since then.
16 Q. Before we get into that, what were you
17    receiving in salary as a lead special ed
18    teacher at East Mountain Road School?
19 A. I think that's when it went to 29,000.
20 Q. So when you went to the middle school,
21    were you a special education teacher
22    there, as well?
23 A. Yes.
24 Q. What were you receiving in salary there?

Page 15

1  A. Well, it kept jumping. I mean, all I know
2     is from the last time I was working, I was
3     receiving, like, $40,000 a year.
4  Q. So Westfield Middle School was the last
5     job that you had?
6  A. South Middle School, yeah. Since I had
7     been working there, they opened up two
8     middle schools. So they called one south
9     and one north. I was at the south.
10 Q. You started there in the fall of '98?
11 A. Let's see, yeah, '98.
12 Q. When was the last day that you worked
13    there?
14 A. October 15, 2002.
15 Q. Do you recall what your starting salary
16    was when you started there?
17 A. When I started there at first, no, I
18    don't.
19 Q. Do you think you were making around 40
20    when you left?
21 A. Yes.
22 Q. Why did you leave your job at Westfield
23    Middle School South?
24 A. That was -- the day after I left is when I

Page 16

1     went in for surgery on my knee.
2  Q. Which knee?
3  A. My right knee.
4  Q. What procedure was being performed?
5  A. Arthroscopic knee surgery.
6  Q. Do you know what they were doing to your
7     knee?
8  A. They were going in to scrape or something.
9     I'm not exactly sure what the procedure
10    was. I mean, it was supposed to help me.
11    That was what it was supposed to do.
12 Q. So when you left your job at Westfield
13    Middle School on October 15, 2002, did you
14    resign or did you go on leave?
15 A. I went on leave.
16 Q. And --
17 A. I'm still on leave.
18 Q. Are you receiving disability payments from
19    them?
20 A. Not from Westfield Middle School. I did
21    receive, for a short time, disability from
22    a different company, a separate policy.
23    It was through the teachers' union that
24    the policy was through.

Page 17

1  Q. Are you receiving any income presently?
2  A. No.
3  Q. Other than the lawsuit that brings us here
4     today, have you ever been a plaintiff or a
5     defendant in a lawsuit?
6  A. I had a car accident in '94. It wasn't --
7     it never went to court or anything. It
8     was a settlement.
9  Q. You were the plaintiff?
10 A. Yes.
11 Q. Do you recall how much you received in the
12    settlement?
13 A. I think it was 10,000.
14 Q. Did you suffer personal injuries in that
15    accident?
16 A. Yes, I did. I had a pinched nerve.
17 Q. Where?
18 A. In my neck.
19 Q. Anything else?
20 A. That's basically what was diagnosed. It
21    was whiplash or whatever you want to call
22    it. I was kind of shaken up from it. I
23    had missed some time at work, got treated,
24    and went back.

Page 18

1  Q. Have you been convicted of a misdemeanor
2     in the last five years?
3  A. No.
4  Q. Have you been convicted of a felony in the
5     last ten years?
6  A. No.
7  Q. At some point, were you involved in an
8     accident at the Westfield Wal-Mart?
9  A. Yes.
10 Q. When was that?
11 A. February 1, 2002.
12 Q. Do you recall what time of the day it was,
13    Mrs. Leader?
14 A. It was in the morning, around 9:15 I'd
15    say, something like that.
16 Q. Why were you at Wal-Mart that day?
17 A. Well, I went in there to get a tape for my
18    students because we had a big day planned.
19    This was their -- we have a behavior award
20    system and so it was their big trip for
21    the month.
22       We were getting Dunkin' Donuts for
23    breakfast and we were going to have --
24    they were going to go ice skating and then

Page 19

1  coming back and I was doing a thing on
2  black history month. I needed the tape,
3  which was called, "Our Friend, Martin."
4  Q. Like a cartoon or something?
5  A. Kind of like a cartoon. It's all about
6     Dr. Martin Luther King. It's really
7     educational for them to understand what
8     went on during that time.
9  Q. So as a special ed teacher, are you mostly
10    teaching the kids in a classroom-type
11    environment?
12 A. Yes.
13 Q. When you went to the Westfield Wal-Mart on
14    the date that we are talking about, which
15    is February 1, 2002, were you by yourself?
16 A. Yes, I was.
17 Q. How did you get there?
18 A. I drove.
19 Q. What did you drive?
20 A. At the time, I drove a Grand Marquee. I
21    always get mixed up because I had a Crown
22    Victoria. It was a Ford -- Mercury Grand
23    Marquee.
24 Q. Standard or automatic?

Page 20

1  A. Automatic.
2         MR. MCCARTHY: I defy you to find
3     a standard Grand Marquee.
4         MR. STEELE: I'm not a car guy. I
5     have to ask the questions.
6         MR. MCCARTHY: It's one of those
7     boats like the state police drive.
8         THE WITNESS: It is and I loved
9     it, except for during the snow.
10 Q. Had you been to the Westfield Wal-Mart
11    before?
12 A. Many times.
13 Q. Did you make regular trips to the
14    Westfield Wal-Mart?
15 A. Yes.
16 Q. How often?
17 A. I'd say probably once a week.
18 Q. Were you on any medications that day?
19 A. I was taking medicine for my allergies and
20    asthma at the time.
21 Q. So the answer is yes, you were on
22    medication?
23 A. Yes.
24 Q. Other than the allergy medication, was

Page 21

1  there anything else that you were taking
2  that day?
3  A. Birth control pill, asthma medicine. Let
4     me think. I probably was taking Prilosec,
5     I think. I'm not sure if there was
6     anything else. That was for heartburn.
7  Q. Anything else you can think of?
8  A. No, I think that was it.
9  Q. Did you have anything to drink
10    alcohol-wise?
11 A. No. It was in the morning.
12 Q. Well, I have to ask the questions.
13 A. Okay. No.
14 Q. You'd be surprised.
15    Were you in a hurry that day?
16 A. I wasn't necessarily in a hurry, but I had
17    a time schedule to keep, yeah. I had
18    first gone to K-Mart and they didn't have
19    the tape, and then I had gone to Wal-Mart
20    to get the tape. I didn't make it to find
21    if they did have the tape at the time.
22 Q. What time did you have to be at school
23    that day?
24 A. We had a two-hour delay. I needed to be

Page 22

1  there at quarter to ten.
2  Q. Approximately how long does it take you to
3     drive from the Westfield Wal-Mart to the
4     middle school where you worked?
5  A. Five minutes.
6  Q. After you parked your car in the parking
7     lot, what happened next?
8  A. I got out of the car and I went into the
9     store. As I was walking into the store, I
10    tripped on the way the rugs were in the
11    store, the rubber part. And I don't
12    really know how or what really happened
13    because I was kind of, like, flailing, you
14    know. I was concerned that there was an
15    older couple in front of me that I was
16    going to knock them over because I had no
17    control after I had tripped.
18       I know I landed on my right knee or
19    I landed on both knees, but it seemed like
20    I must have hit the right knee harder
21    because that's the one that was bruised
22    and bleeding at the time.
23 Q. You entered through the front entrance
24    doors?

Page 23

1  A. Yes.
2  Q. Where are those in relation to the front
3     of the store, at the Westfield store?
4  A. Well, they're closer to the -- like, you
5     drive in. They're closer to the end. So
6     if you're facing it, it would be closer to
7     the left side.
8  Q. The left-hand side?
9  A. Yeah.
10 Q. After you walked through those doors, were
11    you looking down, or were you looking
12    straight ahead?
13 A. Straight ahead.
14 Q. You say you tripped on something. Do you
15    know what it was? Did you know at the
16    time when you tripped on it?
17 A. Yeah, because I had -- my toe. It's,
18    like, my foot or my toe, the area of my
19    shoe, got caught under it and it scuffed
20    my boots that I had on, because they were
21    brand-new.
22       I did figure out that's what it must
23    have been.
24 Q. This was after you fell?

Page 24

1  A. Yes.
2  Q. So is it fair to say that when you
3     actually tripped, you weren't looking
4     down?
5  A. I was looking at the older couple. I was
6     afraid I was going to run into them
7     because I was flailing, you know.
8  Q. Did you run into them?
9  A. No, I didn't. Thank God.
10 Q. Did they see you fall?
11 A. I don't know, to tell you the truth
12    because I didn't pay attention to that. I
13    was pretty much just, like, oh, my gosh; I
14    can't believe this happened and hurting
15    and crying. I don't know if they saw me,
16    to tell you the truth.
17 Q. After you were flailing, did you fall
18    forward?
19 A. Yes.
20 Q. You said mostly on your right knee?
21 A. Well, I fell on both knees. They both
22    hurt, but it was the right knee that
23    really hurt worse.
24 Q. Did you just kind of fall down on two

Page 25

1     knees, or did you fall down on two knees
2     and then fall down on your chest and the
3     front of your body, as well?
4  A. I don't know. I mean, I know that I hit
5     the knees and I'm pretty sure I put my
6     arms down so that my face -- I didn't hit
7     my face. I'm not sure. I don't think I
8     fell on my chest. I didn't fall on my
9     chest. I know that.
10 Q. You think you might have fallen on your
11    hands, as well?
12 A. Yeah. Yeah. After I hit the knees, then
13    I went kind of, like, with the hands and
14    that kind of thing.
15 Q. To your knowledge, did anyone witness your
16    fall?
17 A. I'm not sure. There was a woman at the
18    service desk, but I don't know if she saw
19    me fall. I mean, I know she knows that --
20    knew that it happened because she's the
21    one that called for the manager, and some
22    other guy helped me up.
23 Q. You say that you suspected that what
24    caused you to fall was rugs?

Page 26

1   A. Yes.
2   Q. Did you say that you assumed that's what
3       happened because of your boots?
4   A. Well, there was the overlapping of the
5       rugs. My boot, like, got stuck in it. I
6       mean, you know, that's how it kind of
7       went.
8   Q. Okay. Ms. Leader, I know you're not a
9       professional artist, but I'll ask you, to
10      the best of your recollection, sketch for
11      me the approximate path that you took when
12      you walked into the Westfield Wal-Mart
13      with this piece of paper representing the
14      entire store. Imagine you're in the
15      parking lot.
16  A. Okay. I don't know what doors I walked
17      into. They've got different doors. The
18      doors are kind of, like, here. There is
19      -- I don't know how many doors there are
20      but there is at least four, I would say.
21      There is probably doors over here but I'm
22      not sure exactly. I just came walking
23      through, you know. When I got beyond the
24      doors is where -- and the foyer was here.

Page 27

1   Q. Can you write "F" so we know what you're
2       talking about?
3   A. Sure.
4         (Witness complies).
5   Q. Can you write "D" where the doors are that
6       you came in?
7         (Witness complies).
8   A. Okay. Then the rugs were, like, the
9       rubber pieces were overlapping somehow.
10      I'm not sure how. I don't remember that.
11      Somehow, they were overlapping. That's
12      kinds of where my foot got stuck is, like,
13      in the overlapping rubber part.
14  Q. So that dark circle is where your foot got
15      stuck?
16  A. Yeah, I would say.
17  Q. Can you write an "R" next to the rugs so
18      we know what you're talking about?
19  A. Sure
20        (Witness complies).
21  A. Then I had gone several steps and then
22      fallen somewhere around here. You know, I
23      don't know exactly where I fell but
24      somewhere around this area I would guess.

Page 28

1       Do you want me to write that?
2   Q. Yes, just draw a picture of a person,
3       which would be you, showing were you think
4       you ultimately ended up.
5   A. I'm very bad at drawing
6         (Witness complies).
7   Q. That's okay. It can be a stick figure.
8   A. It isn't going to be good. This is not my
9       skill.
10  Q. So you didn't fall right on the rugs. You
11      fell kind of -- the rugs tripped you?
12  A. Yes.
13  Q. Then you fell?
14  A. I fell on their concrete or cement or
15      whatever floors you want to say they are.
16  Q. There was no carpeting where you
17      ultimately went down on your knees?
18  A. No.
19  Q. Thank you. I appreciate that. Would you
20      be kind enough to just sign your name and
21      put today's date, which is July 13, 2004?
22         MR. STEELE: Let's mark that,
23      please.
24         (Exhibit 1, Diagram,

Page 29

1       so marked).
2   Q. I'm curious about this rug situation here.
3       Was it two different rugs that were
4       overlapping, or was it rugs that had a
5       bump in it or something?
6   A. No, two rugs.
7   Q. Two rugs?
8   A. Overlapping.
9   Q. Did it look like they had been placed on
10      top of each other?
11  A. I don't know. I just know they were,
12      like, overlapping, the rubber part.
13      That's where my foot got stuck in, and it
14      scuffed up the tip of my boots.
15  Q. Did you turn around and look at the rugs
16      after you fell?
17  A. Oh, no.
18  Q. You didn't?
19  A. No. I was on the ground. The manager and
20      older man helped me to the concession
21      area. There was a table there.
22  Q. What I'm trying to understand is how do
23      you know that these rugs were there, first
24      of all, and how do you know that they were

8 (Pages 26 to 29)

Page 30

```
 1   overlapping?
 2  A. Well, because when I was -- well, I don't
 3     know. I just remember seeing it. I think
 4     it was after I had got my foot stuck that
 5     I looked down to see what it might have
 6     been. That's the only thing I can think
 7     of is that I looked down as I was falling
 8     to see what had happened or how I could
 9     stop it from happening.
10  Q. So in that time that you looked down at
11     the rugs, you noticed they were
12     overlapping?
13  A. That's what I'm assuming.
14  Q. You don't know that for sure?
15  A. I know I saw them. I don't know when I
16     saw them. I assume that's the time
17     because I wasn't looking down as I was
18     walking in or else it wouldn't have
19     happened.
20         I know I was focused on getting that
21     movie for the kids.
22  Q. Do you think that maybe you could have
23     looked at the rugs after you fell at any
24     time, or was it definitely before?
```

Page 31

```
 1  A. It had to be before. I don't recall
 2     looking back at them.
 3  Q. When you looked at the rugs and saw them
 4     overlapping, could you tell by looking at
 5     them how long they'd been in that state?
 6  A. No.
 7  Q. You say that you're not sure if anyone saw
 8     you fall; is that right?
 9  A. Right.
10  Q. Who was the first person that you recall
11     seeing or speaking to after you fell?
12  A. It was the woman at the service desk. She
13     yelled as I was falling, I knew that was
14     going to happen, or something like that,
15     about the rugs.
16  Q. When did she yell that?
17  A. I'm not sure if it was as I was falling or
18     after I was falling, but at some point.
19     Then I assumed she called the manager
20     because he came over when I was on the
21     ground.
22  Q. Can you repeat what you recall this woman
23     saying?
24  A. She said, "I knew that was going to
```

Page 32

```
 1     happen."
 2  Q. Did she elaborate on that --
 3  A. No, she didn't.
 4  Q. -- or is that all she said?
 5         Did she say anything else to you?
 6  A. No, not that I can remember.
 7  Q. Did you say anything else to her?
 8  A. Not that I can remember, no.
 9  Q. Do you remember what she looked like?
10  A. The only thing I remember is she was
11     black.
12  Q. She was black?
13  A. Yeah.
14  Q. Was she a heavy, heavy woman, thin woman?
15  A. I don't know.
16  Q. Do you remember how old she was?
17  A. No, I don't.
18  Q. Roughly?
19  A. No.
20  Q. At some point, did someone else arrive to
21     where you had fallen?
22  A. Yeah, it was two gentlemen. Later I found
23     out that one of them was the manager.
24  Q. Were you still on the ground at this
```

Page 33

```
 1     point?
 2  A. Yes, I was.
 3  Q. Approximately how much time elapsed
 4     between when you fell and when those
 5     gentlemen showed up?
 6  A. Seemed pretty quick. I don't know how
 7     much time it was, but it seemed pretty
 8     quick.
 9  Q. A couple of minutes maybe, less than that?
10  A. I would say probably a couple of minutes.
11     I'm not sure.
12  Q. Please describe everything that you can
13     remember about the two gentlemen.
14  A. Everything that I can remember about them?
15     Well, one was older than the other. The
16     manager, I'd say he was probably in his
17     40s or something like that. He was -- he
18     had a kind face. I don't know what else.
19         I didn't feel, you know, afraid or
20     anything. They were trying to help me.
21     He asked if I was okay, and I was, like,
22     no, I hurt myself. You know, and that's
23     pretty much all I can remember about that
24     at that time. They helped me to the
```

G & MO COURT REPORTERS & ASSOCIATES
(617) 338-0030

Page 34

1  concession area and got me a drink of
2  water and some Kleenex. I remember
3  talking with the manager after the
4  incident.
5  Q. Before we get to where they took you, I'm
6  still interested in finding out about the
7  first man who you say was a manager.
8     First of all, how do you know he was
9  a manager?
10 A. He gave me his card at the end, not at the
11 end but somewhere within our discussion,
12 why I was there and what I was getting.
13 He went to go look for the tape for me.
14    When he came back, he said he didn't
15 have the tape and he gave me his name and
16 his phone number and a $25 gift card to
17 buy the tape because they didn't have the
18 tape that I wanted when I went there. He
19 said to buy something else for the kids or
20 something like that.
21 Q. Was this guy a white guy?
22 A. Yes.
23 Q. What about the second man that came over,
24 what do you remember about him?

Page 35

1  A. He was older.
2  Q. 50s, 60s?
3  A. Yeah, maybe. I don't know.
4  Q. Was he a white guy also?
5  A. I think so.
6  Q. Do you remember anything else about him?
7  A. No, because he just pretty much helped me
8  off the ground into the concession area.
9  Q. Did either of these two gentlemen identify
10 themselves or tell you their names or
11 anything like that?
12 A. The manager did.
13 Q. What did he tell you his name was?
14 A. I don't remember his first name. He said
15 -- I think it was Byrum or something like
16 that. He told me he just moved here.
17 Q. Did he say from where?
18 A. He did but I don't recall that. I mean,
19 we talked about the schools because his
20 kid went to north middle, and when they
21 re-did the schools, I went from the south
22 to the north and then back to the south
23 because that's where they sent us all. I
24 told him I knew the building and so forth.

Page 36

1  Q. Just referring to Exhibit 1, the stick
2  figure represents where you ultimately
3  ended up and where you were at the time
4  that we are discussing right now. Can you
5  just mark on here somewhere where the
6  customer service desk was, where the woman
7  was that you say said, "I knew that was
8  going to happen."
9  A. Yes. I would say it's about, like, right
10 in front of the rug area, somewhere, like,
11 here would be customer service. Then it
12 was, like, right after that that there is
13 the concession area.
14 Q. So where you wrote "CS," that's the
15 customer service desk?
16 A. Yes.
17 Q. And then the "C" there?
18 A. I put "CON."
19 Q. That's the concession area?
20 A. Yes.
21 Q. The snack bar?
22 A. Right.
23 Q. Thank you. At some point, did one of
24 those two men help you to your feet?

Page 37

1  A. Yes, they both did.
2  Q. They both helped you to your feet?
3  A. Yes.
4  Q. Did they take you over to the concession
5  area?
6  A. Yes.
7  Q. Were you able to walk on your own?
8  A. No.
9  Q. Were you leaning on them at the time?
10 A. Yes.
11 Q. Where were you feeling pain at the time?
12 A. My knees. I mean, my right knee was
13 really throbbing of pain.
14 Q. Did you say it was bleeding?
15 A. Yes. It wasn't -- I didn't know it was
16 bleeding until the hospital.
17 Q. Was anything else hurting you at the time
18 besides your knees?
19 A. My pride. I mean, I had fallen and the
20 fact that I knew it was going to mess up
21 my day for the kids.
22 Q. Sure.
23 A. But my knees, that's basically what had
24 hurt. That's all I can remember. I was

10 (Pages 34 to 37)

Page 38

1  concentrating on how everything was going
2  to be messed up for the kids.
3  Q. So what happened after those two gentlemen
4     took you over to the concession area?
5  A. I had my shirt on that said South Middle
6     School. The gentleman, the manager, asked
7     me if there was anybody that he could call
8     or something like that. It was pretty
9     much small talk. Then he did -- I don't
10    know if he called or had somebody call.
11    But I told him -- I gave him the number of
12    my school and the secretary's name and to
13    tell her what had happened and that I had
14    hoped that I would be able to -- I didn't
15    say this to him but I had hoped in my head
16    that I would be able to continue, you
17    know, feel better, rest a little bit and
18    feel better.
19       As the time was progressing, as I
20    was sitting there, as we were talking, my
21    knees were just really hurting so much. I
22    knew that I wasn't going to make it to
23    school. He called my husband. I gave him
24    the number to call my husband's father is

Page 39

1  who I was having called because I didn't
2  know exactly where my husband was. So I
3  had him call his parents' house.
4  Q. This $25 gift certificate you say you
5     received, do you still have that?
6  A. No.
7  Q. Did you use it at some point?
8  A. Yes.
9  Q. Do you know where?
10 A. No.
11 Q. Do you know what you bought with it?
12 A. No.
13 Q. So the manager called your school --
14 A. Yes.
15 Q. -- to say you wouldn't be coming in?
16 A. Yeah, either him or somebody else. I
17    don't know who did it exactly.
18 Q. But someone called your school?
19 A. Yes.
20 Q. And called your husband's father?
21 A. Right.
22 Q. What was the purpose of that call?
23 A. I needed somebody to come pick me up. I
24    wasn't able to walk and drive.

Page 40

1  Q. Did someone come pick you up?
2  A. Yes.
3  Q. Before they did, do you recall telling
4     anyone at Wal-Mart the circumstances
5     surrounding your accident?
6  A. What do you mean?
7  Q. Did anyone at Wal-Mart ask you what had
8     happened?
9  A. I don't know. I would assume but I'm not
10    sure.
11 Q. Did you ever give anyone a statement or
12    give anyone an account of what had
13    happened from your perspective?
14 A. Yes, the claims lady that called me later.
15 Q. We'll get to that. I'm interested in that
16    particular day that you fell.
17 A. I don't remember specifically talking
18    about it. I mean, I just assume I did,
19    you know, because he knew I was on the
20    ground. I'm sure he probably asked me
21    what happened, but I don't know if that
22    conversation went on. It doesn't stick in
23    my mind.
24 Q. Do you remember what the weather was like

Page 41

1  that day, Mr. Leader?
2  A. It was snowy.
3  Q. It was snowy out?
4  A. Yes.
5  Q. Was the carpeting in the area that you
6     fell wet?
7  A. I don't know. I didn't feel it.
8  Q. Was the floor wet that you landed on?
9  A. I don't know that either.
10 Q. Were your clothes wet after you fell?
11 A. I don't think so but I'm not sure.
12 Q. You don't remember if you gave a statement
13    to anyone that day, the date of the
14    accident?
15 A. Right.
16 Q. You remember giving a statement to someone
17    after the accident.
18 A. Yes.
19 Q. So at some point, someone came to pick you
20    up?
21 A. Yes.
22 Q. Who was that?
23 A. My husband came and his mother.
24 Q. Did you go get in their car with them?

11 (Pages 38 to 41)

Page 42

1  A. The manager brought a wheelchair over to
2     give me a ride over to the car, which was
3     right out in front of the door.
4  Q. Did someone push your wheelchair out to
5     the car?
6  A. Yes.
7  Q. Who was that?
8  A. I don't know.
9  Q. Could it have been the manager?
10 A. I'm not sure. I think it was my husband,
11    but I'm not sure.
12 Q. When you got into the car, did someone
13    have to help you get into the car?
14 A. Yes.
15 Q. Who was that?
16 A. My husband.
17 Q. Was he driving the car?
18 A. Yes.
19 Q. Where did you end up going?
20 A. I went back to his parents' house.
21 Q. Which is were?
22 A. It's in Westfield, East Mountain Road.
23 Q. What happened next?
24 A. My husband helped me into the house, and I

Page 43

1     called the doctor's office, my primary
2     doctor, to see if I could get in to see
3     somebody because I knew I was hurt.
4        They said because it was an accident
5     at Wal-Mart that I couldn't go there; the
6     insurance wouldn't pay for it and that I
7     needed to go to the emergency room and
8     because they didn't have appointments
9     available. So it was kind of a
10    combination of things they told me.
11    Basically, get lost.
12 Q. What a system we have.
13    MR. MCCARTHY: Love health
14    insurance. It makes things run so
15    smoothly.
16 Q. Did you go to the ER that day?
17 A. Yes.
18 Q. Who took you there?
19 A. My husband.
20 Q. Were you ultimately seen by some doctors?
21 A. Yes.
22 Q. Where was that?
23 A. That was at Noble Hospital.
24 Q. After the doctors examined you, what did

Page 44

1     they tell you?
2  A. That I had contusions, abrasions, you
3     know, and gave me some pain medication.
4     They gave me, like, a sheet. Keep ice on
5     it, heat, something like that. They have,
6     like, sheets made up of if you have
7     something wrong with your knees or your
8     hands or whatever and they hand them to
9     you, that kind of thing.
10       It was a Friday, so they said if it
11    was still bothering me to follow-up with a
12    doctor on Monday.
13 Q. Did you do that?
14 A. Yes, I did.
15 Q. Which doctor did you go to on Monday?
16 A. Dr. Drinker.
17 Q. Is he your PCP?
18 A. No. He's an orthopedic.
19 Q. Did you get a referral to see him?
20 A. Yeah.
21 Q. From whom?
22 A. From my PCP.
23 Q. You went to see your PCP first?
24 A. No. I just -- you don't have to. You

Page 45

1     just have to call and say you need a
2     referral.
3  Q. So was your knee bothering you over the
4     weekend; is that why you called?
5  A. It was terrible, yeah. I didn't get out
6     of bed much.
7  Q. Could you walk on your own?
8  A. Just barely.
9  Q. This is your right knee; is that right?
10 A. They both hurt but, yeah, more the right.
11    MR. STEELE: Can we take a
12    five-minute recess?
13    MR. MCCARTHY: Yeah. I was just
14    going to suggest that.
15       (Off the record).
16    MR. STEELE: Back on the record.
17 Q. When you saw Dr. Drinker the Monday after
18    the accident, did he examine you?
19 A. Yes.
20 Q. What did he tell you after he examined
21    you?
22 A. He said the same thing, contusions,
23    abrasions.
24 Q. Did he prescribe you anything?

12 (Pages 42 to 45)