Page 18

1    A.    No.
2    Q.    Do you know who the -- strike that.
3          Is your maintenance department
4    structured with a supervisor then employees
5    under them?
6    A.    Yes.
7    Q.    Is there one supervisor for all
8    maintenance?
9    A.    Yes.
10   Q.    Who is that?
11   A.    Me.
12   Q.    So there is nobody between you and
13   the line workers so to speak in the maintenance
14   department?
15   A.    On third shift there would be the
16   third shift assistant manager.
17   Q.    Who was the third shift assistant
18   manager in February '02, do you know?
19   A.    I don't recall.
20   Q.    Would that person show up on these
21   payroll records?
22   A.    No. That person would not because
23   that person is a salaried member of management.
24   Q.    But you show up on these reports.

Page 19

1    And you are the manager, correct?
2    A.    Yes.
3    Q.    Is that you, Don A. Byram?
4    A.    That's me.
5    Q.    It just doesn't reflect any hours?
6    A.    It doesn't reflect any hours.
7    Q.    So your assistant manager's name is
8    most likely on here?
9    A.    The assistant manager's name is on
10   there.
11   Q.    So if you were to review these
12   documents, and I'm not asking you to do it now,
13   would you be able to determine who the assistant
14   manager was on the third shift?
15   A.    Yes.
16        MR. McCARTHY: Can I ask that you
17   and Wal-Mart Counsel go through that
18   exercise outside this deposition and
19   identify this individual for me? Are you
20   willing to do that or we can do that now?
21        MR. STEELE: Which would you
22   prefer?
23        MR. McCARTHY: I would prefer not
24   to spend an hour here of him reading

Page 20

1    through unless the person's name begins
2    with A.
3         Off the record.
4
5         (Off record conference)
6
7         MR. McCARTHY: Back on the record.
8    Q.    (By Mr. McCarthy) Mr. Byram, off
9    the record we had a discussion about the third
10   shift maintenance process of putting the
11   inclement weather mats down.
12         Did Wal-Mart do that work in 2002?
13   A.    No. There was a third party
14   company.
15   Q.    What was the name of that company?
16   A.    I don't know offhand.
17   Q.    Is there some records that you
18   could look at back at your office or at the
19   store that could tell you that?
20   A.    Yes.
21   Q.    Would you be willing to do that and
22   give Mr. Steele that information?
23   A.    Yes.
24   Q.    Now who makes the call or the

Page 21

1    decision to put mats down?
2    A.    No one specific individual. It
3    depends, it really depends on the weather.
4    Q.    And are your employees in the
5    maintenance department or in this case a third
6    party contractor instructed that if you got bad
7    weather coming then you take certain steps?
8    A.    Yes.
9    Q.    What were the hours of the Wal-Mart
10   store in February 2002?
11   A.    Seven a.m. to ten p.m.
12   Q.    Have those hours changed?
13   A.    Yes.
14   Q.    What are the hours now?
15   A.    Seven a.m. to eleven p.m.
16   Q.    Do you have any twenty-four hour
17   departments?
18   A.    No.
19   Q.    I'm going to show you some
20   documents that were produced by Wal-Mart in this
21   case, Mr. Byram, and the first one will be
22   marked three.
23
24         (Exhibit 3, Risk Control, marked)

6 (Pages 18 to 21)

Page 26

1  and it says in Exhibit 1 by S.D. What does S.D.
2  mean?
3      A.  Service desk.
4      Q.  That doesn't mean who did it.
5  That's where it was?
6      A.  Location.
7      Q.  So these mats were thirty feet
8  inside the store itself?
9      A.  Yes.
10     Q.  Do you recall how many mats were
11 present?
12     A.  Specifically, no, I do not recall
13 that. Generally speaking it was four mats.
14     Q.  How big were these mats?
15     A.  Specific size I don't remember.
16     Q.  Were they big enough to fill an
17 eight by twelve room?
18     A.  No.
19     Q.  So they were smaller than that.
20         But they wouldn't be little door
21 mats that you put in your front door of your
22 house?
23     A.  No.
24         MR. McCARTHY: Please mark these.

Page 27

1      (Exhibits 5, Safety Sweep Program,
2       marked)
3      (Exhibit 6, Safety Sweep
4       Guidelines, marked)
5      (Exhibit 7, Customer Safety Lesson,
6       marked)
7      (Exhibit 8 Store Housekeeping,
8       Floor Care, marked)
9
10     Q.  (By Mr. McCarthy) Mr. Byram, I am
11 going to show you what's been marked as Exhibit
12 5 and ask you to identify that for the record
13 please.
14     A.  Safety sweep program.
15     Q.  Is that a policy or protocol that
16 applies to your Wal-Mart store?
17     A.  Yes, it does.
18     Q.  Is it another one of the policies
19 or protocols that were prepared by Wal-Mart
20 corporate for lack of a better phrase?
21     A.  Yes.
22     Q.  And disseminated to the stores?
23     A.  Yes.
24     Q.  As a manager it's your

Page 28

1  responsibility to see that that program is
2  implemented, is that correct?
3      A.  Yes, it is.
4      Q.  I show you what's been marked as
5  Exhibit 6. Can you identify for the record?
6      A.  Safety sweep guideline.
7      Q.  And same series of questions.
8          Is that a protocol policy and
9  standard that applies to your Wal-Mart store?
10     A.  Yes.
11     Q.  Is that prepared by Wal-Mart
12 corporate?
13     A.  Yes.
14     Q.  And it is your responsibility as a
15 manager to see that that is implemented, is that
16 correct?
17     A.  That's correct.
18     Q.  I'm going to show you Exhibit 7
19 and ask you to identify that for the record.
20     A.  It is from training resources
21 customer safety lesson.
22     Q.  And is that another standard or
23 protocol that applies to your Wal-Mart store?
24     A.  Yes, it does.

Page 29

1      Q.  Did it apply in February of 2002?
2      A.  Yes, it did.
3      Q.  And as with the others, it was
4  prepared by Wal-Mart corporate and disseminated
5  to the stores?
6      A.  That's correct.
7      Q.  And it's your job to make sure it's
8  followed, correct?
9      A.  Yes.
10     Q.  An let me show you this what's been
11 marked as Exhibit 8 and ask you to identify that
12 for the record.
13     A.  Store housekeeping floor care.
14     Q.  Again, is that a standard or
15 protocol that applies to your Wal-Mart store?
16     A.  Yes.
17     Q.  It applied in February of 2002?
18     A.  Yes.
19     Q.  And again as with the others, is a
20 protocol and standard that is prepared by
21 Wal-Mart corporate and disseminated to the
22 store?
23     A.  Yes.
24     Q.  And it's your responsibility as

Page 22

1  Q.  (By Mr. McCarthy) Exhibit 3 is a
2  document that has the words at the top of it
3  Risk Control and below that Slip Trip Fall
4  Solutions, correct?
5  A.  That's correct.
6  Q.  Are you familiar with that
7  document?
8  A.  Yes, I am.
9  Q.  I'm going to ask you to -- first of
10 all, is there a hard copy of that document kept
11 at your store?
12 A.  We have it accessible through the
13 computer system.
14 Q.  So you don't have a loose leaf
15 filler somewhere?
16 A.  No.
17 Q.  On page two of that document in the
18 middle of the page it says "have an inclement
19 weather plan in place" and underneath that it
20 says "action points." Do you see that?
21 A.  Yes.
22 Q.  And do you see in that action
23 points where the number, I think it's number
24 five, it describes. What does that say?

Page 23

1  A.  Number five says "have red tape
2  available to secure the mat to the floor."
3  Q.  And was this a policy that was
4  prepared by Wal-Mart corporate?
5  A.  Yes.
6  Q.  It's disseminated to the stores?
7  A.  Yes.
8  Q.  Do you receive, as a manager do you
9  receive training on things on a regular basis?
10 A.  Yes.
11 Q.  Is it your responsibility to
12 implement this policy in particular at your
13 store?
14 A.  Yes.
15 Q.  And have you informed your
16 maintenance people -- did you inform you
17 maintenance people in February of 2002 that they
18 are required to use red tape to secure mats to
19 the floor?
20 A.  I do not recall.
21 Q.  Do you remember ever telling
22 anybody that?
23 A.  Yes.
24 Q.  When is the last time you showed

Page 24

1  somebody that?
2  A.  I do not recall.
3  Q.  If there was not red tape taping
4  the mat down to the floor, it would have been in
5  violation of standard protocols and procedures
6  for Wal-Mart on February 1, 2002?
7  A.  It would have been in violation of
8  the protocol set forth here. You also would
9  have to take into consideration the type of mat,
10 because throughout our company with different
11 companies that we contract with for the mats you
12 might have different mats.
13 Q.  And is that differentiation made in
14 this policy?
15 A.  No, it's not.
16 Q.  Where does the authority to make
17 that differentiation come from?
18 A.  Corporate office.
19 Q.  Is that in writing?
20 A.  Not to my knowledge.
21 Q.  And how would a store manager get
22 permission to deviate from the corporate
23 procedures that were handed down?
24 A.  We do not have permission to

Page 25

1  deviate.
2  Q.  But failure to tape the mats down
3  would be a deviation from this policy, correct,
4  that you are looking at, Exhibit 3?
5  A.  Yes.
6  Q.  Now I know you didn't see Mrs.
7  Leader fall and you testified that you don't
8  have a memory of it. Based on what is in this
9  Exhibit 1, your report, where did she fall?
10 Can you tell us?
11 A.  Under Incident General Information
12 customer fell on large rain rug by service desk.
13 Q.  Would that be in the vestibule
14 area of the store?
15 A.  No. It would be, at the time
16 before our remodel it would have been
17 approximately thirty feet inside the store.
18 Q.  Inside of the store near the
19 entrance?
20 A.  Yes, near the front entrance.
21 Q.  And those mats were not permanent
22 mats, correct?
23 A.  That's correct.
24 Q.  They are mats that were put down,

Page 30

1  manager to see that that is followed?
2   A. Yes.
3   Q. Now on Exhibit number 7, Mr.
4  Byram, at the bottom of page one it says Trip
5  Hazards. It says "all Associates need to watch
6  for trip hazards around the store."
7       Who are Associates?
8   A. Employees of Wal-Mart.
9   Q. Every employee of Wal-Mart other
10 than a manager are referred to as an associate?
11  A. All employees of Wal-Mart are
12 referred to as associates.
13  Q. So that's not some specific class
14 of employee? That's everyone?
15  A. That's everyone.
16  Q. It would include the greeter and
17 service desk people?
18  A. Yes.
19  Q. And one of the things they are to
20 watch out for is up-turned corners of carpets or
21 mats?
22  A. That's correct.
23  Q. And do you have any record of a
24 report from anyone that day that there was a

Page 31

1  problem with the mats being up-turned at all?
2   A. No.
3   Q. The mats I'm referring to are the
4  mats in front of the store.
5       Mr. Byram, at the front of your
6  store in February of 2002 there was located a
7  video monitor, was there not?
8   A. Yes.
9   Q. That video monitor, if you were a
10 customer and you are walking in, you could see
11 yourself walk in?
12  A. That's correct.
13  Q. And kids loved it, is that right?
14  A. Yes, still do.
15  Q. Can you tell me whether that is a
16 monitor or whether it recorded?
17  A. It was recorded.
18  Q. And on what? On video tape?
19  A. Yes.
20  Q. And how many hours? How long a
21 tape did you have?
22  A. A tape is twenty-four hours long.
23  Q. What do you do with the tape after
24 twenty-four hours?

Page 32

1   A. We retain them for thirty days.
2       If there was no need for them to
3  be kept after that point in time then they are
4  recorded over.
5   Q. Where do you retain them? At the
6  store?
7   A. Yes.
8   Q. In an office somewhere?
9   A. Yes.
10  Q. Is there any protocol or standard
11 from Wal-Mart risk management department that if
12 in a situation such as this, somebody falls and
13 hurts themselves or that kind of incident
14 occurs, that you retain those tapes?
15  A. If they requested it.
16  Q. If who requested?
17  A. CMI.
18  Q. Who is CMI?
19  A. Claims management corporation.
20  Q. So depends on whether they ask?
21  A. Yes.
22  Q. If they haven't asked within thirty
23 days you don't retain them?
24  A. No.

Page 33

1   Q. You tape over them?
2   A. We re-use and tape over them.
3   Q. In this case was CMI involved?
4  Can you tell from that? Feel free to look at
5  this.
6   A. They were involved because this is
7  where the report went to.
8   Q. After you sent in that report did
9  you have any other conversation with anyone from
10 CMI about this incident?
11  A. Not that I recall.
12  Q. And how does it work with regard to
13 the video tape? Do you have to wait until you
14 hear from them?
15  A. Yes.
16  Q. So you have given them notice
17 almost immediately essentially?
18  A. Yes.
19  Q. Certainly within a few hours?
20  A. Yes.
21  Q. How is it transmitted to them?
22  A. Through the computer system.
23  Q. Email?
24  A. It's our own Internet service, yes.

**Page 34**

1  Q. And so someone at CMI would have
2  had -- now CMI is a separate corporation from
3  Wal-Mart?
4  A. I do not know.
5  Q. So you don't know if they are
6  Wal-Mart employees or not?
7  A. I honestly don't know.
8  Q. Did you have some training with
9  regard to their procedures and practices?
10  A. Can you rephrase that.
11  Q. Did you get specific training, you
12  as a manager, as in terms of what you are
13  suppose to do in terms of how you are suppose to
14  interact with CMI?
15  A. I'm sorry. I don't think I quite
16  understand.
17  Q. Did you get as a manager, get
18  specific training with regard to CMI procedures,
19  what they wanted you to do? What you were
20  suppose to do? How you were suppose to interact
21  with them?
22  A. Yes.
23  Q. Who gave you that training?
24  A. I don't know if there was a --

**Page 35**

1  there is -- I don't know if there is --
2  Q. Did you go in a class room and get
3  instructions?
4  A. No.
5  Q. Did you go to a conference
6  somewhere and get instructions?
7  A. No.
8  Q. So you got it in some form of
9  writing?
10  A. The best answer I can give you on
11  this one is whenever this particular system
12  rolled out and it's a fairly self-explanatory
13  system, I'm sure we had information come down at
14  that time on this, how you fill it out, this is
15  how you do it, and then you sit down and do it.
16  Q. But you didn't go to CMI or have
17  someone from them come to you and sit down with
18  you and say this is what you have to do?
19  A. No.
20  Q. And no question or answer period
21  about specific aspects of what they needed?
22  A. No.
23  MR. STEELE: Two minutes?
24  MR. McCARTHY: Sure. Off the

**Page 36**

1  record.
2  (Off record conference)
3
4  (Exhibit 9, General Liability Trip
5  Fall Claims, marked)
6
7  MR. McCARTHY: Back on the record.
8  Q. (By Mr. McCarthy) I have one more
9  Exhibit I want to ask you about, Mr. Byram.
10  That's Exhibit 9. Have you seen that document
11  before?
12  A. No, I have not.
13  Q. Do you know where that came from?
14  A. No.
15  At the bottom it says CMI which is
16  the claim management.
17  Q. Do you recognize the information
18  on that sheet of paper?
19  A. It appears to be, I'm assuming that
20  it is customer incidents or accidents at 2174.
21  Q. Which is your store?
22  A. Yes.
23  Q. And it's a listing, it has names of
24  people and some description of what happened?

**Page 37**

1  A. Yes.
2  Q. And dates when these things
3  happened?
4  A. Yes.
5  Q. But you have never seen that
6  document or one similar to it before today?
7  A. Can you define for me.
8  Q. Let me ask it another way.
9  A. No. I have not seen this document.
10  Q. Do you as store manager get reports
11  of that nature from CMI with regard to claims
12  made by customers in your store?
13  A. Yes.
14  Q. On the far right side on the top
15  there is something call CLS date. Do you see
16  that?
17  A. Yes.
18  Q. Do you know what that means?
19  A. I am going to make an assumption.
20  It's claims dates.
21  Q. That's an assumption. I don't
22  want you to make assumptions. If you know.
23  A. No, I do not.
24  Q. And I understand it wasn't produced

10 (Pages 34 to 37)

Page 38

1  by you.
2      Now at the bottom the last entry is
3  Michele Leader.
4      A.   That's correct.
5      Q.   And it indicates February 1, 2002
6  under something call ENT date?
7      A.   That's correct.
8      Q.   And that's the date that she got
9  injured?
10     A.   I would make that assumption, yes.
11     Q.   Your report indicates that,
12 doesn't it?
13     A.   Yes.
14          Can you tell me what that date is?
15     Q.   No. That's why I asked you.
16          And you can't ask me questions
17 anyway but that's okay. Sometimes you ask
18 questions because you want to know the answer.
19          My first thought was a claim
20 date but it can't be. So we will have to leave
21 that mystery for another day. You can ask
22 claims the next time you talk to them.
23          Your store configuration, the
24 entrance way is different today than it was in

Page 39

1  February of 2002?
2      A.   That's correct.
3      Q.   Would you happen to have any
4  photographs of the entrance way and the interior
5  area up to the service desk in that general
6  vicinity either from behind or going toward it?
7      A.   As it was set up then?
8      Q.   Yes.
9      A.   Off the top of my head, I can't
10 think of anything off the top of my head.
11     Q.   You didn't take pictures before you
12 started re-doing it?
13     A.   No.
14     Q.   Do you know if there was a floor
15 plan or architectural drawing of what it looked
16 like at that point in time, that's February of
17 2002?
18     A.   I'm sure there had to be.
19     Q.   Would that be something in your
20 store?
21     A.   No.
22     Q.   Do you know where those kind of
23 plans or drawings would be kept?
24     A.   Corporate office.

Page 40

1      MR. McCARTHY: Counsel, I would ask
2  if we could get either a photograph or the
3  floor plan showing the dimensions of that
4  entrance area. I don't need the whole
5  store. I don't want the whole store. But
6  as of February 1, 2002. Can you make an
7  inquiry or would you prefer a Rule 34?
8      MR. STEELE: If you haven't already
9  asked for it, just do a formal request and
10 if we have it you will get it.
11     Q.   (By Mr. McCarthy) Are you going
12 to be promoted or moved out of here soon?
13     A.   Not to my knowledge.
14     Q.   You haven't requested any change of
15 venue?
16     A.   I actually have put in for a
17 position.
18     Q.   In a different place?
19     A.   Same -- I would not be leaving the
20 area for a job description.
21     Q.   And so you would expect to still be
22 in the area for the next six months to a year?
23     A.   Yes.
24     Q.   Do you know Michele Leader in any

Page 41

1  way aside from this incident?
2      A.   Not to my knowledge.
3      Q.   Do you have children that go to
4  school in Westfield public schools?
5      A.   Yes, I do.
6      Q.   What school do they go to?
7      A.   Now or at the time?
8      Q.   In 2002.
9      A.   I had one child at the Westfield
10 High School and two children at the North Middle
11 School.
12     Q.   And I don't mean to be offensive.
13 Were either of the children special education
14 students?
15     A.   No.
16     Q.   To your knowledge has your store
17 ever hired Mr. Leader to do any fabrication of
18 sheet metal or anything of that nature for your
19 store?
20     A.   No.
21     MR. McCARTHY: That's all I have.
22     MR. STEELE: Don, you have the
23 right to read and sign the transcript
24 that's created today and check it for

Page 42

errors. Would you like to do that?

THE WITNESS: Yes, I would.

MR. STEELE: The witness would like to read and sign his transcript. And would you be kind enough to state that the deposition is complete.

STENOGRAPHER: The deposition is complete.

(Deposition completed)

Page 43

I, TACY A. MALANDRINOS, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that DON BYRAM appeared before me and satisfactorily identified himself on July 15, 2004 at the offices of DOHERTY, WALLACE, PILLSBURY and MURPHY, P.C., 1414 Main Street, Monarch Place, Springfield, Massachusetts, and was by me duly sworn to testify to the truth and nothing but the truth as to his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath and said examination reduced to writing by me; and that the statement is a true record of the testimony given by the witness, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of counsel/attorney for any of the parties, nor a relative or employee of such parties, nor am I financially interested in the outcome of the action.

WITNESS MY HAND this 3rd day of August, 2004.

Tacy A. Malandrinos My Commission expires:
Notary Public June 9, 2006

Page 44

Today's Date: August 3, 2004
To: Chauncey D. Steele IV, Esq.
Copied to: Attorneys McCarthy and Day
From: Tacy Malandrinos
Deposition of: DON BYRAM
Taken: July 15, 2004
Action: MICHELE LEADER, LANCE LEADER, KURTIS LEADER ppa LANCE LEADER
V.
WAL-MART STORES, INC.

==========================================

Enclosed is a copy of the deposition of DON BYRAM. Pursuant to the Rules of Civil Procedure, Mr. Byram has thirty days to sign the deposition from today's date.

Please have Mr. Byram sign the enclosed signature page. If there are any errors, please have him mark the page, line and error on the enclosed correction sheet. He should not mark the transcript itself. The certification and addendum should be forwarded to all interested parties.

Thank you for your cooperation in this matter.

Page 45

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION
No. 04-30055-MAP

* * * * * * * * * * * * * * * * * *
MICHELE LEADER, LANCE LEADER, *
KURTIS LEADER ppa LANCE LEADER, *
Plaintiffs *
V. *
WAL-MART STORES, INC., *
Defendant *
* * * * * * * * * * * * * * * * * *

I, DON BYRAM, do hereby certify, under the pains and penalties of perjury, that the foregoing testimony is true and accurate, to the best of my knowledge and belief.

WITNESS MY HAND, this day of , 2004.

______________________
DON BYRAM

